NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LAYSTROM MANUFACTURING CO.,
Respondent.

No. 15257.

United States Court of Appeals
Seventh Circuit.

April 19, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, William J. Avrutis, Atty., N. L. R. B., Washington, D. C., for petitioner.

Philip D. Goodman, Chicago, Ill., for respondent.

Before SCHNACKENBERG, SWYGERT and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of the National Labor Relations Board, pursuant to Sec. 10(e) of the National Labor Relations Act, as amended (29 U.S.C.A. Sec. 151 et seq.), for enforcement of its order issued against Laystrom Manufacturing Co. (respondent or company) on April 8, 1965. The Board's decision and order are reported at 151 NLRB No. 144. Respondent concedes that it is engaged in commerce, that the alleged unfair labor practice occurred in Chicago, Illinois, and that no jurisdictional question is presented.

The Board, contrary to its Trial Examiner, found that the company violated Sec. 8(a) (5) and (1) of the Act by withdrawing recognition from the Union (Tool and Diemakers Lodge No. 113, International Association of Machinists, AFL-CIO), after the close of the Union's certification year, on a claim of doubt as to the Union's majority status—an asserted doubt which the Board concluded to be without any reasonable basis in the objective facts.

There is no dispute as to the evidentiary facts which, with the exception of the oral testimony of respondent's president, were stipulated. The Trial Examiner in his decision reviewed the facts and concluded that respondent had not violated Sec. 8(a) (5) and (1) of the Act and recommended that the complaint be dismissed. The Board in its decision and order, without taking issue with the findings as made by the Examiner, concluded, contrary to the Examiner, that the certified Union continued to represent a majority of the employees in the appropriate unit; that respondent, in March 1964, had no reasonable basis for believing otherwise, and that respondent, therefore, violated the Act as charged.

A brief statement of the facts, even though not in dispute, seems to be es-

sential. On April 27, 1960, after an election, the Board certified the Union as the bargaining representative of respondent's toolroom employees. Following the Union's certification, respondent and the Union negotiated and established two successive one-year collective bargaining agreements. By its terms, the second contract would expire on June 1, 1962. On March 15, 1962, respondent filed a petition with the Board to conduct an election for the purpose of determining whether a majority of the toolroom employees still desired to be represented by the Union, and on June 1, 1962, an election was held. The tally of ballots showed seventeen cast for the Union, thirteen against, and two challenged. On June 11, 1962, the Board again certified the Union as the majority representative of respondent's toolroom employees.

On June 4, 1962, respondent and the Union entered into a collective bargaining agreement which, by its terms, would expire June 2, 1964. This agreement contained a "union security" clause which required membership in the Union as a condition of employment. On March 16, 1964, respondent notified the Union that it was terminating the agreement as of its scheduled expiration date and had filed a petition with the Board to conduct an investigation to determine whether the Union currently represented a majority of the toolroom employees.

One week later, on March 23, 1964, the Union filed a Charge, alleging that respondent violated the Act by its refusal to bargain. The Regional Director of the Board investigated this Charge, and on May 1, 1964, recommended that respondent bargain with the Union. On May 4, 1964, respondent advised the Regional Director that it could not enter into negotiations with the Union for a new agreement without giving the toolroom employees an opportunity to vote by secret ballot on whether a majority wanted continued representation. On May 7, 1964, respondent informed its employees of all the facts on which its "good faith doubt" of the Union's majority was based and why it could not accept the Regional

Director's recommendation to bargain for a new agreement without first having the question of the Union's majority properly established. On May 22, 1964, respondent advised the Union in writing of its offer to enter into negotiations with the Union for a new contract, with the understanding that such agreement would not be signed until the Union's majority status was properly established. On May 29, 1964, the Union rejected respondent's offer.

Inasmuch as we agree with the Examiner's analysis of the situation as it relates to the good faith issue, as well as his conclusion in this respect, we think we can do no better than quote from his decision. He stated:

"* * * The close vote in the 1962 election, the stipulated fact that 16 of the 35 employees eligible to vote in that election had in the interim left their employment, and the union-shop provision are factors which, while perhaps not determinative, must be considered relevant and accorded due weight. * * *

"* * * So far as the record shows, no serious dispute between the parties has, until this proceeding, arisen and there is no evidence or claim that the respondent has ever interfered with or coerced employees in the exercise of their right to select their own bargaining representative. * * *

"Plainly the circumstances here described are not those which reasonably lead to the inference of 'bad faith.' Stipulations noted above show that the parties have negotiated, executed and presumably have administered three bargaining agreements, with no claim of bad faith in any respect. After the first two yearly contracts the Respondent asked for an election. There is no evidence that the Union objected to proving its majority status again, and it did so, although by a narrow margin. A 2-year contract was then executed— one which required membership as a condition of employment.

"Toward the expiration date of the latest agreement the employer again

asked for an election. This time the Union declined, apparently, and chose to stand fast on the union-shop requirement as proof that it was, and is, the lawful agent of all employees in the unit."

Thus, we have a situation where respondent and its employees had enjoyed an harmonious and friendly relationship for a period of four years. There is no evidence but that respondent during that period accorded the Union every right and privilege to which it was entitled under the Act. Two years previously respondent had expressed a doubt as to the majority status of the Union and had petitioned for an election. On that occasion the Union acquiesced and won the election by a few votes.

The Trial Examiner in his decision stated:

"The Trial Examiner discerns nothing in the long relationship of the parties that may be construed as 'bad faith' on the part of the Respondent. The past, then, lacks circumstances from which an inference of 'bad faith' in this action may be drawn—or even, in the opinion of the Trial Examiner, an inference of lack of good faith, a distinction which it would seem General Counsel claims."

We add that with respondent's long-time good faith dealing with the Union, there is no basis for a reasonable inference that it abruptly changed its course of conduct and for the first time acted in bad faith in raising the issue as to the Union's majority. Good faith is not a one-way street. The Union's refusal, when challenged, to submit the issue to an election where each employee would be permitted in secrecy to make his choice, leads to the inescapable inference that it, too, was doubtful and fearful of the result. As the Trial Examiner stated:

"And it is equally reasonable to speculate that a union may prefer to let the Board handle its hot chestnuts with tongs of technicalities instead of going to an election. A suspicion is not alien in the setting described above that

perhaps the Union doubts that it could win an election today."

Respondent places much reliance upon Stoner Rubber Co., Inc., 123 NLRB 1440. Of course, this case can be distinguished on the facts, as the Board does, but the reasoning is pertinent. The Board stated:

"An employer can hardly prove that a union no longer represents a majority since he does not have access to the union's membership lists and direct interrogation of employees would probably be unlawful as well as of dubious validity. Accordingly, to overcome the presumption of majority the employer need only produce sufficient evidence to cast serious doubt on the union's continued majority status."

If the Union had assented to an election as it had on previous occasions or had used any other means available by which it could have established its continuing majority status, there is little doubt on this record but that respondent would have acceded to its bargaining request, and this extended and expensive litigation in all probability would have been avoided.

No good purpose could be served in citing or discussing the many cases called to our attention, which are distinguishable because of different factual situations. We shall refer to a few of the cases of this Circuit. N. L. R. B. v. John S. Swift Co., Inc., 7 Cir., 302 F.2d 342; N. L. R. B. v. Crean, etc., 7 Cir., 326 F.2d 391; N. L. R. B. v. Economy Food Center, Inc., 7 Cir., 333 F.2d 468, and N. L. R. B. v. Elliott-Williams Co., Inc., 7 Cir., 345 F.2d 460. True, in each of these cases the Court allowed the Board's petition for enforcement of its order, based in part at least on the employer's refusal to bargain. A reading of these cases, however, will show the marked contrast in the factual situation in each case from that here.

In Swift, among many other factors which the Court considered, was the fact that the employer was burdened by a long history of unfair labor practices and litigation which militated against its

good faith claim. The situation in the instant case is directly to the contrary.

In Crean, the Court (326 F.2d page 396) quoted at length from the Trial Examiner's decision which discloses the marked difference between the facts there and here. In that case, the Trial Examiner decided against the employer; in the instant case, in its favor.

Economy Food Center, Inc. is another case in which the employer was burdened with numerous unfair labor practices, including its refusal to recognize authorization cards submitted by the Union to show its majority status. This Court stated (333 F.2d page 472):

> "The Board concluded that since the Company made no attempt to learn the facts and 'deliberately shut its eyes to the facts * * * and assiduously avoided giving the union any real opportunity to substantiate its claims,' its conduct was not indicative of good faith."

In the instant case, as shown, the Union when challenged made no effort to disclose its majority status.

*Elliott-Williams Company* is another case in which the employer refused to recognize proof submitted by the Union in support of its majority status. We noted (345 F.2d page 464):

> "Where, as in this case, the union had proof of its majority status readily available and respondent chose not to learn the facts, it 'took the chance of what they might be.'"

In these cases and many others which could be cited, the evidence showed bad faith on the part of the employers, which negated a claim that refusal to bargain was made in good faith. In the instant situation, there is no proof of respondent's bad faith and no proof from which a reasonable inference to that effect can be drawn.

Contrary to the conclusion reached by the Board, we agree with the Trial Examiner " * * * that the circumstances of this case, including the expressed willingness of the Respondent to negotiate a renewal of a contract, its execution subject only to proof at a Board election, sufficiently establish a 'good faith' doubt to warrant a recommendation that the complaint be dismissed and that the employees themselves—whose rights the Act was designed to protect—be given an opportunity to express themselves at a secret election."

The Board's petition for enforcement of its order is denied.