NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

FRICK COMPANY, Respondent.

No. 17961.

United States Court of Appeals,
Third Circuit.

Argued Jan. 5, 1970.

Decided April 1, 1970.

Michael Rosenbloom, NLRB, Washington, D. C., for petitioner (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John I. Taylor, Arnold A. Hammer, Attys., NLRB, on the brief).

Warren M. Laddon, Morgan, Lewis & Bockius, Philadelphia, Pa., for respondent (Robert H. Kleeb, Philadelphia, Pa., on the brief).

Before BIGGS, ALDISERT and STAHL,[1] Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, petitions for enforcement of its order[2] against respondent

---

1. Judge Stahl participated in the hearing and decision of this case but died before the opinion of the court was filed.

2. 175 N.L.R.B. No. 39 (1969).

Frick Company. The Board found that the Company had violated § 8(a) (1) and (5) of the Act by withdrawing recognition from the Union [3] which had been duly designated as bargaining representative by a majority of the employees in an appropriate unit, and thereafter refusing to bargain with the Union. The Board found that the Company did not have a good faith doubt of the Union's majority status, and ordered the Company to bargain with the Union.

The parties are before us for the second time. The facts and our decision in the earlier case, N.L.R.B. v. Frick Co., 397 F.2d 956 (3 Cir. 1968) (*Frick I*) are directly relevant to the present issue.

There we found that,

[a]fter a one day strike, Frick agreed, on April 1, 1965, to recognize that * * * [union] as the bargaining representative of the production and maintenance employees of its Waynesboro, Pennsylvania plant. Between April 5 and May 14 the parties * * * met on Monday and Friday of each week in bargaining sessions aimed at concluding a mutually satisfactory collective bargaining agreement. The sessions resulted in an impasse and consequently, on May 17, the union called a strike.

*Id.* at 958.

During the course of the strike the Company engaged in certain conduct which we found in *Frick I* to constitute unfair labor practices. Specifically, we determined that:

(1) the Company "violated section 8(a) (1) of the Act by having its supervisors threaten the strikers with loss of their jobs, by improperly asserting that the strikers if they did not abandon the strike could only return, if at all, as new employees, and by taking photographs of the strikers as

they solicited for strike funds," 397 F.2d at 961;

(2) the Company violated § 8(a) (1) and (3) of the act by "transferring the names of the strikers to its inactive 'Quit' file and consequently depriving the strikers of their vacation pay," *id.* at 961, 962–964; and

(3) by threatening the strikers with loss of vacation pay unless they returned to work, the Company had converted an economic strike into an unfair labor practice strike as of July 9, 1965. *Id.* at 964.

The unfair labor practice strike continued into 1966 and was ended by the Union on April 6. While the strike was in progress, many strikers returned to work. At the same time, the Company hired a substantial number of replacements for other strikers. Thus, although all but four of the approximately 525 employees in the bargaining unit walked out at the beginning of the strike, by April 4, 1966, two days before the end of the strike, 202 of the strikers had returned, and the Company had hired 246 replacements. On June 1, 1966, the day on which the Company withdrew recognition from the Union and refused to bargain further, there were still the 202 returning strikers and approximately 225 replacements. In addition, 101 of the employees, who had remained on strike for the full period, had, by then, been reinstated to their former jobs.

On January 27, 1966, while the strike was still in progress, the Company had advised the Union that it was terminating the recognition agreement as of April 1, 1966. Nevertheless, upon request of the Union for a meeting to "explore the possibility of a settlement of our differences," contract negotiations resumed on March 25, 1966, and three more meetings followed.

---

3. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.

On June 1, 1966, in reply to a Union inquiry about a further meeting, the Company stated that "it is now uncertain as to whether or not your Union represents a majority * * *. The Company does not now believe that your Union represents a majority of the employees in an appropriate unit." Consequently, the Company informed the Union that there was nothing "to be gained by further meetings at this time." The Company reiterated its position in a letter of July 11, 1966.

The Board found that the Company had violated § 8(a) (1) and (5) of the Act because it withdrew recognition from the Union on June 1, 1966, and refused thereafter to recognize and bargain with the Union when it did not have good faith doubt of its majority status. Accordingly, the Board ordered the Company to bargain with the Union as the exclusive representative of its employees in the unit.

## I.

The Board's holding that the Company violated the Act when it withdrew recognition of the Union rests in the first instance on the rules of the Board respecting the establishment and continuance of bargaining relationships. Where a bargaining relationship has been properly established either by Board certification or, as here, by voluntary recognition,[4] the representative status of the Union is presumed to continue for a reasonable period and the presumption is irrebuttable. Brooks v. N.L.R.B., 348 U.S. 96, 103–104, 75 S.Ct. 176, 99 L.Ed. 125 (1954); Keller Plastics, Inc., 157 N.L.R.B. 583 (1966).

In the case of a certified union, the reasonable time during which its majority status may not be challenged is ordinarily one year. Brooks v. N.L.R.B., *supra*, 348 U.S. at 98, 75 S.Ct. at 176; N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1090 (8 Cir. 1969). And although a presumption of majority status continues *after* one year, it then becomes rebuttable.[5] In such circumstances an employer may refuse to bargain without violating the Act "if but only if, he in good faith has a reasonable doubt of the Union's continuing majority." Laystrom Manufacturing Co., 151 N.L.R.B. 1482, 1483–1484 (1965), enforcement denied on other grounds, 359 F.2d 799 (7 Cir. 1966); *accord*, N.L.R.B. v. Rish Equipment Co., *supra*, note 5, 407 F.2d at 1101.[6] An employer must, how-

---

4. There is no question presented here as to the validity of the Company's initial recognition of the Union. Although the Company contends in its brief that it counted only the backs of authorization cards presented by the Union, the Board found in *Frick I* that the Union was validly recognized on April 1, 1965, as representing a majority of the employees, 161 N.L.R.B. 1089, 1102 (1966), and the trial examiner in the instant case properly considered the finding as binding. In any event, it is clear that regardless of the manner in which the authorization cards were presented, the Company, on April 1, 1965, had no basis for questioning the Union majority because on the previous day, March 31, a majority of the employees had participated in a strike in support of the Union's recognition demand. As the Supreme Court recently observed in N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 597, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), a union may establish its majority status by a showing of

"convincing support, for instance, by a union-called strike or strike vote."

5. N.L.R.B. v. Little Rock Downtowner, Inc., *supra*, 414 F.2d at 1091; N.L.R.B. v. Rish Equipment Co., 407 F.2d 1098, 1100 (4 Cir. 1969).

6. In N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Board, with Supreme Court approval, announced its abandonment of the "good faith doubt" standard as previously applied in cases involving an employer's initial refusal to recognize a union which had organized a majority of the employees. Under the Board's new test an employer may refuse recognition and demand an election without regard to whether he has a good faith doubt of the union's majority, provided he has committed no contemporaneous unfair labor practice. If unfair labor practices have been committed, however, the employer may be ordered to bargain without an

ever, come forward with evidence casting "serious doubt on the union's majority status." Stoner Rubber Co., 123 N. L.R.B. 1440, 1445 (1959). As the court said in N.L.R.B. v. Rish Equipment Co., *supra*, note 5, 407 F.2d at 1101: " '[M]ore than an employer's mere mention of [its good faith doubt] and more than proof of the employer's subjective frame of mind' * * * [are necessary.] What is required is a 'rational basis in fact.' " [7]

■ The issue presented here is whether the rules of the Board relating to the withdrawal of recognition from a certified union, after the one year certification period, may be applied equally to the withdrawal of recognition from a voluntarily recognized union after the passage of a "reasonable time."

Respondent Frick Company contends that these rules should not apply here because "[a] union which has not been certified should not be afforded the same status as one which has won a secret election." The Company suggests that a non-certified union is not entitled to a presumption of continued majority

after it has had reasonable opportunity to obtain a contract, and that an employer should be able to withdraw recognition without being required to present evidence of "serious doubt" of the Union's majority status. If such were the rule, the burden would be on the General Counsel from the beginning to establish, unaided by any presumption, that the Union did, in fact, have a majority at the time recognition was withdrawn.[8] We agree with the Board, however, that the Company's position is untenable.

It is true that the Supreme Court has noted distinctions between an exclusive bargaining agency established by election and one established by less formal means, insofar as the one year conclusive presumption of continuance is concerned. In Brooks v. N.L.R.B., *supra*, 348 U.S. at 101, 75 S.Ct. at 180, n.9, the Court said that "both before and after the Taft-Hartley Act, the Board and the courts did not apply the [one year certification] rule to a collective bargaining relationship established other than as a result of a certification election." More recently, in N.L.R.B. v. Gissel Packing

election, if the employer's conduct either is

'of such nature that [its] coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had', * * * [or has a serious] tendency to undermine majority strength and impede the election processes.

*Id.* at 614, 89 S.Ct. at 1940.

In *Gissel*, and in subsequent similar cases, *see* Atlas Engine Works, Inc. v. N.L.R.B., 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969), because the Board had framed its findings in terms of the employer's lack of good faith doubt, the Court remanded the cases to the Board for new findings in accordance with the changed standard.

In the instant case, the Board's findings are also framed in terms of the respondent's lack of good faith doubt. Upon careful examination of the *Gissel* decision, however, we have concluded that neither the Board nor the Supreme Court intended the new standard announced therein for refusals to recognize in an organizational context to apply to cases involving

a withdrawal of recognition from a validly recognized union.

In the *Gissel* type of situation, the emphasis is on fulfilling the national labor policy of assuring employees a free choice of representatives by the most reliable method. In the case of withdrawal of recognition, however, competing considerations of assuring the stability of an established bargaining relationship are involved. On this basis, the Board has in the past distinguished between refusals to recognize and withdrawals of recognition. *See* Aaron Bros. Co., 138 N.L.R.B. 1077, n. 8 (1966). We find no reason in *Gissel* for not continuing to do so. Accordingly, we conclude that the Board's findings in terms of the Company's lack of good faith doubt are proper and that *Gissel* and *Atlas* do not require us to remand this case to the Board for new findings.

7. *Accord*, N.L.R.B. v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5 Cir. 1966) ; N.L.R.B. v. Downtown Bakery Corp., 330 F.2d 921, 925 (6 Cir. 1964) ; N.L.R.B. v. John J. Swift Co., 302 F.2d 342, 346 (7 Cir. 1962).

8. *Cf.* Stoner Rubber Co., *supra*.

Co., *supra,* note 6, 395 U.S. at 599, n.14, 89 S.Ct. at 1932, the Court, citing *Brooks,* named as one advantage enjoyed by certified unions the "protection for a reasonable period, usually one year, against any disruption of the bargaining relationship because of claims that the union no longer represents a majority."

We do not understand these observations of the Supreme Court to preclude the Board from extending to voluntarily recognized unions the benefits of either or both of the rebuttable or irrebuttable presumptions of continued majority status. This is a matter peculiarly within the province of the Board in its implementation of the policy of the National Labor Relations Act. As the Court pointed out in *Brooks,* the one year certification rule was developed by the Board. The Taft-Hartley Act simply approved and reinforced the Board-made rule by providing that no election to determine a bargaining representative could be held within one year of a prior election. 348 U.S. at 103–104, 75 S.Ct. 176. See N.L.R.B. v. Universal Gear Service Corp., 394 F.2d 396, 397 (6 Cir. 1968). The Court also noted that the Board's rule that an employer who has a good faith doubt of the Union's continuing majority after the passage of the certification year may refuse to bargain, "is a matter appropriately determined by the Board's administrative authority." 348 U.S. at 104, 75 S.Ct. at 182. By the same token, we are of the view that the Board may, within its authority, properly apply the rebuttable presumption of continued majority status to unions which have been recognized voluntarily.

We do not believe that by naming the one year irrebuttable presumption of majority status as an advantage of a certified union the Supreme Court meant that the Board was necessarily precluded from extending the same benefit to voluntarily recognized unions. As we have noted above, the Board, with court approval, has in fact applied the irrebuttable presumption of representative status for a reasonable time, to unions having received voluntary recognition,[9] without specific adoption of the one year period.

In like manner, we think the Board is free to determine that the rebuttable presumption of continued majority status evolved for certified unions should also apply in the case of unions voluntarily recognized. This is an area which involves the weighing of two conflicting goals of national labor policy: preserving employees' free choice of bargaining representatives, and providing stability for established bargaining relationships. In this situation we believe that "the Board should be left free to utilize its administrative expertise in striking the proper balance." N.L.R.B. v. Montgomery Ward & Co., 399 F.2d 409, 412 (7 Cir. 1968).

We are reinforced in this view by the recent decision of the Second Circuit which upheld application of the rebuttable presumption of continued majority status to an uncertified, voluntarily recognized union with a previous bargaining history with the employer. N.L.R.B. v. Master Touch Dental Laboratories, Inc., 405 F.2d 80, 82 (2 Cir. 1968). Significantly, the court said that "supporting the finding of a rebuttable presumption of continuing majority status are cases finding such a presumption with respect to a certified union following the expiration of the certification year." *Id.* at 83 n.3.

## II.

The Company next asserts that, contrary to the findings of the trial examiner and the Board,[10] it did in fact have a rational good faith basis for doubting the Union's majority.

9. N.L.R.B. v. San Clemente Publishing Corp., 408 F.2d 367, 368 (9 Cir. 1969); N.L.R.B. v. Montgomery Ward & Co., 399 F.2d 409, 412–413 (7 Cir. 1968); N.L.R.B. v. Universal Gear Service Corp., *supra,* 394 F.2d at 397–398; Keller Plastics, Inc., *supra.*

10. The Board adopted *in toto* the findings and conclusions of the trial examiner. 175 N.L.R.B. No. 39 (1969).

The trial examiner found that on June 1, 1966, the date recognition was withdrawn, the composition of the bargaining unit was as follows: 225 new employees, not union members, who had been hired as replacements during the strike; 4 employees who had not gone out on strike initially; and 101 employees who had been reinstated after the end of the strike. The Company thus claims that it had good reason to believe that a majority of the unit (225 new employees, 202 workers who returned to work during the strike,[11] and 4 non-strikers) was anti-union and that, therefore, the withdrawal of recognition was justified.

■ The Company's argument, however, conveniently overlooks the determination of this court in *Frick I, supra,* that the strike, while initially an economic one, was converted into an unfair labor practice strike on July 9, 1965. The unfair labor practices committed by the Company in July and August of 1965, were designed to induce and coerce the workers to abandon the strike and to discourage membership in the union. 397 F.2d at 961–963. The Company cannot profit by offering the wrongfully induced return of unfair labor practice strikers as evidence to rebut the presumption of continued majority status.[12] As stated by the court in N.L.R.B. v. Little Rock Downtowner, Inc., *supra,* 414 F.2d at 1091, n. 4, "an employer may not avoid the duty to bargain by demonstrating a loss of majority status arising from its own unfair labor practices." [13]

The Company, nevertheless asserts that it was at least entitled to consider the 40 strikers who returned to work prior to the commission of the unfair labor practices as having abandoned the Union. This number, the Company claims, coupled with the 225 new employees and the four non-strikers, would still be sufficient to provide a rational basis for a good faith doubt of the union's majority, untainted by the unfair labor practices found in *Frick I.*

■ We are unable to accept this reasoning. First, the Board correctly concluded that, "even in the absence of unfair labor practices, there is no presumption that an employee's return to work during a strike demonstrates a rejection of the union as his bargaining representative." That the employees returned may have been nothing more than "a vote of no confidence in the strike action, and [was] not necessarily a repudiation of the Union in its repre-

---

11. The trial examiner found that about 40 of the employees who returned to work during the strike did so before the Company committed its first unfair labor practice on July 9, 1965, and that the others returned after the strike had been converted to an unfair labor practice strike. In making this finding, the examiner credited the testimony of Craig, a union representative, and disbelieved the testimony of a Company officer who estimated that 75% of the returning strikers had come back before July 1, 1965.

The determinations of the Board on issues involving credibility are, of course, entitled to great weight, and we see no reason in this case to depart from our normal rule that "[t]he responsibility to resolve issues of credibility is for the Board and not for the Court." N.L.R.B. v. Wings & Wheels, Inc., 324 F.2d 495, 496 (3 Cir. 1963).

12. The Company argues that since a number of employees did not abandon the strike until several months after the unfair labor practices were committed, any causal effect of the unlawful conduct was too remote to be considered a factor in inducing the return to work. We agree with the Board, however, that the burden was on the Company as the wrongdoer to demonstrate that the effect of its improper conduct had been dissipated, a burden which the Company has not undertaken. As emphasized later, even if the Company could show that the return of the strikers was not attributable to its unlawful conduct, the return to work does not necessarily mean that the employees abandoned the Union.

13. *Accord,* Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944) ; Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 704–705, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).

sentative capacity." West Fork Cut Glass Co., 90 N.L.R.B. 944, 956 (1950), enforced in relevant part, N.L.R.B. v. Borchert, 188 F.2d 474 (4 Cir. 1951).[14] The Company could not, therefore, rationally assume that the returning strikers had abandoned the Union.

■ Second, we believe that it was proper for the Board to rule that the Company is precluded from relying on the number of replacements hired during an unfair labor practice strike as evidence rebutting the presumption of continuing majority status.[15] As the trial examiner pointed out, the Company's unfair labor practices not only undercut the Union but had a natural tendency to impede "a settlement of the strike. A corollary of this is that if the strike had been settled at an early date and not prolonged by Respondent's unfair labor practices, * * * there may never have been 202 strikers who abandoned the strike and returned to work or 239 replacements for strikers." [16]

■ Finally, the Company contends that, even conceding it was an unfair labor practice to withdraw recognition from the Union in June, 1966, a bargaining order is not an appropriate remedy at this time, more than three and a half years later.[17] To require bargaining with the Union now, the Company suggests, would undermine the Congressional policy of assuring employees' freedom of choice in selecting a bargaining rep-

---

14. *Accord*, Palmer Asbestos & Rubber Co., 160 N.L.R.B. 723, 730 (1966).

The Company relies on Stoner Rubber Co., *supra*, 160 N.L.R.B. 1440 (1959), and Celanese Corp., 95 N.L.R.B. 644 (1951), to support its contention that returning strikers provide a basis for doubting the union's majority. Examination of these cases, however, reveals that the Board merely indicated that the totality of evidence in each case was sufficient to uphold the employer's claim of good faith doubt. The fact that employees had abandoned a strike was only one of several factors taken into consideration. Furthermore, in both cases the Board stressed the fact that no unfair labor practices had been committed by either employer. We think the Board could properly determine in the instant proceeding that, in the totality of circumstances presented, *the return of strikers to work did not indicate an abandonment of the union.*

15. Additionally, as the cases cited by the Board indicate, the presumption of a union's majority status is generally given *continued effect*

during the period of litigation of the contemporaneous unfair labor practices, and for a reasonable period of time after they have been remedied, in order to give the bargaining relationship * * a reasonable chance to operate and succeed without outside interference or improper pressure.

N.L.R.B. v. Rish Equipment Co., *supra*, 407 F.2d at 1100. *Accord*, N.L.R.B. v. Little Rock Downtowner, Inc., *supra*, 414 F.2d at 1091; N.L.R.B. v. John J. Swift Co., *supra* note 7, 302 F.2d at 346.

This rule represents a partial recognition that when a company which has committed unfair labor practices contests the resultant unfair labor practice charges, the extended period of litigation involved in itself serves to undermine union strength. See Wolkinson, The Remedial Efficacy of NLRB Remedies in Joy Silk Cases, 55 Cornell L.Rev. 1, 11–12 (1969) ; Comment, Employer "Good Faith Doubt", 116 U.Pa.L.Rev. 709–711 (1968).

16. In *Frick I*, we found "substantial evidence in the record to support the * * * Board's finding that [unfair labor practices] *prolonged* the economic strike and thus transformed it into an unfair labor practice strike." 397 F.2d at 964. (Emphasis added.)

17. There is no merit to the Company's suggestion that the passage of time is of itself sufficient to make the bargaining order an inappropriate remedy. *In* N.L.R.B. v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962), the Court said, "[i]nordinate delay in any case is regrettable, but Congress has introduced no time limit into the Act except that in § 10(b)." *See also* Bryant Chucking Grinding Co. v. N.L.R.B., 389 F.2d 565, 568 (2 Cir. 1967), cert. denied, 392 U.S. 908, 88 S.Ct. 2055, 20 L.Ed.2d 1366 (1968). *Cf.* N.L.R.B. v. J. H. Rutter-Rex Manufacturing Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969).

It should be noted that a major part of the delay in issuing the complaint in this case resulted from the Company's litigation of the charges in *Frick I*, which were not resolved until enforcement by this court was granted on June 17, 1968.

resentative. We would, perhaps, look with more favor upon this argument if it were being made by the employees themselves or by a rival union on their behalf. There is nothing in this record to suggest, however, that the employees have ever sought to disassociate themselves from the Union or to join another union.

In summary, we conclude that the principles upon which the Board based its order were within its administrative authority, and that in applying these principles the Board's findings that the Company violated § 8(a) (1) and (5) of the Act, by refusing to bargain with the Union, are supported by substantial evidence in the record considered as a whole.

The order of the Board will be enforced.