**PICK–MT. LAUREL CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1131.

United States Court of Appeals,
Third Circuit.

Argued Nov. 15, 1980.

Decided June 10, 1980.

Howard L. Kastel (argued), Alan S. Rutkoff, Altheimer & Gray, Chicago, Ill., Frederick J. Rohloff, Archer, Greiner & Read, Haddonfield, N. J., for petitioner.

Jay E. Shanklin (argued), Barbara Bado, N. L. R. B., Washington, D. C., for respondent; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., of counsel.

Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

Petitioner Pick-Mt. Laurel Corporation (hereinafter "Pick") petitions, pursuant to 29 U.S.C. § 160(f), for review of the National Labor Relations Board's order of January 12, 1979 ordering Pick to recognize and bargain with Local 170, Bartenders, Hotel, Motel and Restaurant Employee Union, AFL–CIO (hereinafter "Union"). The General Counsel cross-petitions for enforcement of the Board's order, pursuant to 29 U.S.C. § 160(e). This case raises the issue of the obligation of a successor employer to bargain with the incumbent Union when the successor alleges it entertains in good faith a reasonable doubt as to the Union's majority status based in part on the circumstances surrounding the recognition of the Union which occurred more than six months before change in employer ownership.

### II.

On February 9, 1977, P–B Associates, a limited partnership which included Pick as a general partner, purchased hotel and restaurant facilities, known as the Mt. Laurel Hilton Inn, from MLH Development Company (hereinafter "MLH").[1] Pick operated the hotel and restaurant from the date of the acquisition by P–B Associates, pursuant to a management contract. The circumstances surrounding the initiation of the Union's relationship with MLH, the predecessor employer, are the basis of Pick's contentions on review.

MLH began operation of the hotel on June 5, 1975. In February 1975, months before the hotel opened for business, the Union and MLH began negotiations directed to their subsequent relationship. The Union and MLH had reached substantial agreement on the terms of their contract by April 22, 1975 before any employees were hired. That agreement was executed on June 1, 1975, stated it was effective from

---

1. The hotel had been operated for the development company by a management company, Hospitality Management Services, Inc. Since there is no need for our purposes to distinguish between them, both will be referred to as "MLH."

the preceding date of December 5, 1974 to December 4, 1977, recognized the Union as exclusive bargaining representative of employees "engaged in housekeeping, laundry, repair and maintenance, and restaurant and bar activities" with some listed exceptions, and contained a union security clause. That clause provided that employees who were members of the Union at the time the agreement became effective would remain members of the Union, that employees who were not members would join the Union on or after the ninetieth day following the effective date of the agreement, and that employees hired after the effective date of the agreement would become members on or after the thirtieth day following their hiring.[2]

MLH began its initial hiring of employees in May and continued throughout June 1975. In practice, from May 1975 until February 1977 Wayne Gotta, MLH's assistant food and beverage director, regularly required employees to execute an application for membership in the Union and a dues checkoff authorization card at the time of employment, rather than within thirty days as provided by the written agreement.

During the course of the negotiation for the sale of the hotel, in late 1976 or in January of 1977, hotel general manager Daniel Cummings told Ralph Lewy, Pick's vice-president and treasurer, that he believed the contract had been negotiated before any employees were hired.

When Pick took over the operation of the hotel on February 9, 1977, it retained all of MLH's employees, including all supervisors; all employees retained the same job classifi-

cations. At that time there were approximately 80 employees in the bargaining unit; by February 24 there were 103. There was no change or hiatus in the operation of the hotel.

After Pick began operations, Cummings, who remained as hotel general manager, reported that he had heard of employee dissatisfaction with the Union in late 1976 and continuing through 1977.[3] However, there was no evidence that any unit employee revoked the dues checkoff authorization, resigned from the Union, or attempted to file a decertification petition.

On February 23, 1977, Union vice-president McBride asked Cummings for payment of funds which he claimed were owed to the Union by MLH under the collective bargaining agreement. On the same day McBride began to solicit signed authorization cards from bargaining unit employees. On February 24, Cummings gave McBride a check drawn on MLH's bank account for Union dues withheld by MLH from employee's paychecks, but refused to make any such payment on behalf of Pick and told McBride that he had been instructed that Pick would not have further dealings with the Union.

On February 25, 1977, after consultation with its lawyer about its doubt as to the Union's status, Pick filed a representation petition seeking a Board conducted election to determine the Union's status as collective bargaining representative. On the same day, McBride called a strike. Thirty-nine of the 103 employees in the unit failed to report to work at their next scheduled work date.

2. The National Labor Relations Act provides that it shall not be an unfair labor practice for an employer to make an agreement with a labor organization requiring "as a condition of employment membership [in the union] on or after the thirtieth day following the beginning of such employment . . . ." 29 U.S.C. § 158(a)(3).

3. Cummings testified that seven employees complained directly to him and in addition he was told of other complaints by department heads. A supervisor testified as to her opinion that 90 per cent of the 24 or 25 employees in

her department were opposed to the Union, but could name only six employees who expressed that opposition directly to her. Another management employee testified about opposition to the Union. In addition, there was some testimony by unit employees concerning their own or other unit employees' dissatisfaction with the Union. A Union steward testified to having five to seven conversations with fellow employees, of whom she named four, concerning possible replacement of the Union as collective bargaining representative.

On April 22, the Regional Director of the Board's Fourth Region issued a complaint against Pick, based on charges which had been filed by the Union on March 4, alleging that Pick had committed unfair labor practices by refusing to bargain with the Union. The Regional Director then sought a temporary injunction in federal district court to require Pick to bargain. Following three days of hearings in May 1977, the district court denied the NLRB petition, holding that a temporary injunction was not warranted in view of the "substantial credible and uncontroverted evidence of the existence of [Pick's] good faith doubt" of the Union's majority status. *Hirsch v. Pick-Mt. Laurel Corp.*, 436 F.Supp. 1342, 1358 (D.N.J.1977).

On May 27, 1977 the Regional Director dismissed Pick's representation petition because of the pending unfair labor practice charge. A hearing was held on that charge before an Administrative Law Judge on May 31, 1977.[4] Almost a year later, on May 5, 1978, the ALJ issued his opinion in favor of the NLRB's position which was affirmed with minor modifications by the Board on January 12, 1979. The ALJ concluded that Pick was a successor employer, that the contract between MLH and the Union established the latter's presumptive majority status, and that Pick did not succeed in rebutting the presumption by demonstrating a reasonable good faith doubt of the Union's majority status. The ALJ held that Pick's attempt to attack the validity of the contract on the basis of the circumstances surrounding its inception was precluded by the statute of limitations in § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). The ALJ did not consider Pick's contention that the illegality of the contract was an objective consideration supporting a reasonably based good faith doubt of majority status. The Board considered this argument, held that it too was precluded by the § 10(b) limitation period, affirmed the conclusions of the ALJ and ordered Pick, *inter alia*, to recognize and bargain with the Union.

4. The case was submitted to the ALJ primarily on the basis of portions of the transcript in the injunction proceeding before the district court.

III.

Pick's argument in support of its petition to review and set aside the decision and order of the Board is essentially twofold. Pick argues that a union which was recognized by an unlawful prehire contract and which has received unlawful employer assistance continuously thereafter is not entitled to a presumption of continued majority status. Pick's second contention is that even if a presumption of majority status is warranted in this case, the Board erred in holding that the circumstances surrounding the initial recognition of the Union by the predecessor employer must be disregarded in determining whether Pick entertained a good faith reasonable doubt of the Union's majority status because those events occurred more than six months before charges were filed.

The presumption of majority status has its genesis in the NLRB rule, approved by the Supreme Court in *Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954), that created an "almost" irrebuttable presumption that a union certified as a result of a Board conducted representation election may not have its majority status challenged for a "reasonable" period, ordinarily one year. Thereafter, the presumption of majority status continues, but becomes rebuttable. The presumption can be rebutted if the employer shows that the union is in the minority or that the employer had a good faith reasonable doubt of majority support at the relevant time. *Id.* at 104, 75 S.Ct. at 181; *NLRB v. Vegas Vic, Inc.*, 546 F.2d 828, 829 (9th Cir. 1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 54 (1977); *Terrell Machine Co. v. NLRB*, 427 F.2d 1088, 1090 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970).

The presumption of continued majority status applicable to certified unions has also been applied to unions which have been voluntarily recognized. *NLRB v. Frick Co.,*

423 F.2d 1327, 1332 (3d Cir. 1970). We have noted that these presumptions emerged from "the weighing of two conflicting goals of national labor policy: preserving employees' free choice of bargaining representatives, and providing stability for established bargaining relationships." *Id.* The same considerations apply even when the voluntary recognition of the union has not been reduced to writing. *NLRB v. Broad Street Hospital and Medical Center*, 452 F.2d 302, 303 (3d Cir. 1971).

The Board has also established a presumption of majority status which binds the employer for the period during which the contract would be a bar to an election petition. *Pioneer Inn Associates v. NLRB*, 578 F.2d 835, 838 (9th Cir. 1978); *Shamrock Dairy, Inc.*, 119 N.L.R.B. 998, 1002 (1957), 124 N.L.R.B. 494, 495–96 (1959), *enforced sub nom. International Brotherhood of Teamsters, Local 310 v. NLRB*, 280 F.2d 665 (D.C.Cir.), *cert. denied*, 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188 (1960); *Hexton Furniture Co.*, 111 N.L.R.B. 342, 344 (1955); *see also NLRB v. West Sand and Gravel Co.*, 612 F.2d 1326, 1331 (1st Cir. 1979); *NLRB v. Morse Shoe, Inc.*, 591 F.2d 542, 545 (9th Cir. 1979); *NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 593 (2d Cir. 1961). This presumption stems from a previously enunciated Board rule, the contract-bar rule, which bars an election petition while a contract is in effect for a specified period. Currently, the contract-bar rule operates to bar an election petition during the term of an agreement which has a duration of no more than three years or which is filed during the first three years of an agreement covering a longer period. *General Cable Corporation*, 139 N.L.R.B. 1123, 1125 (1962). The transformation of the contract-bar rule into the presumption of continued majority status based on a pending contract has therefore substantially enlarged the period of the presumptive majority by extending it from one year to a possible three years. This extension was based on the Board's determination of need for a greater measure of stability of labor relations. *Id.* As a result of the contract-bar rule and the presumption of majority status, under ordinary circumstances no challenge to the Union's status could have been launched by the employer, employees, or a competing union during the pendency of the contract in this case, which did not exceed three years.

Pick argues that the presumption of continued majority status should not be applied in this case because it is a successor employer, and not the employer who originally accorded the voluntary recognition to the Union. The obligation of a successor employer brings into play a number of competing policy considerations which are central to labor relations policy. They are the need for an employer to retain flexibility in the transfer of business assets, the right of the parties to have freedom of contract, the interests of the employees in job security, and the interests of the entire economy in industrial stability. In considering the obligations of successor employers, the Supreme Court has attempted to balance these factors.

In *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 285, 92 S.Ct. 1571, 1581, 32 L.Ed.2d 61 (1972), the Board argued that "the stability of labor relations [would] be jeopardized and that employees [would] face uncertainty and a gap in the bargained-for terms and conditions of employment . . . unless the [successor] employer [was] held to have assumed, as a matter of federal labor law, the obligations under the contract entered into by the former employer." In rejecting this contention, the Court stated that:

> [H]olding . . . the new employer bound to the substantive terms of an old collective bargaining contract may result in serious inequities. A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital.

*Id.* at 287–88, 92 S.Ct. at 1582. Since the congressional policy "manifest in the Act is to enable the parties to negotiate for any protection either deems appropriate," *id.* at 288, 92 S.Ct. at 1582, the Court held that the successor's obligation was limited to a requirement that it bargain with the incumbent union.

■ It follows from *Burns* that the appearance of a successor employer cannot deprive a union of its presumptive majority status. One might question whether the rationale for the presumption, the maintenance of stability in labor relations, is applicable when a successor appears, because the change in employers has already disrupted the stability of the employer-employee relationship, and the successor's freedom to reject the terms and conditions of the contract perforce deprives the employees of their job security and expectations.[5] However, that argument would inevitably lead to a conflict with the requirement enunciated in *Burns* that a successor employer has an obligation to bargain. The presumption of majority status given to an incumbent union should be viewed as a concomitant of the successor employer's obligation to bargain.

On the other hand, it is clear from the *Burns* decision that the successor employer would not have an obligation to bargain if it entertained a good faith doubt about the union's majority status in the bargaining unit. Thus the Court specifically noted that in light of the fact that there had been an election a few months earlier at which the union had been designated the bargaining agent for the employees in the unit and a majority of those employees had been hired by the successor for work in the identical unit, "it was not unreasonable for the Board to conclude that the union certified to represent all employees in the unit still represented a majority of the employees and that Burns could not reasonably have entertained a good-faith doubt about that fact." *Id.* at 278, 92 S.Ct. at 1577. The

inference is unmistakable that a good faith doubt would have relieved Burns of the obligation to bargain. Since the presumption of majority in that case arose from a certification election, the Court did not consider the interaction between the duty to bargain which it imposed on the successor employer and the presumption of majority status arising from a pending contract. However, one of the bases it gave for rejecting the contention that a successor must observe the existent contract was that a contrary holding would have required the successor "to observe the contract despite good-faith doubts about the union's majority during the time that the contract [was] a bar to another representation election." *Id.* at 290, 92 S.Ct. at 1583. The Court also appeared to cite approvingly prior Board cases which permitted a non-assuming successor to raise a good faith doubt as to the union's majority as a defense to a refusal to bargain charge during the term of the old contract. *Id.* at 290 n. 12, 92 S.Ct. at 1583 n. 12 (citing *Randolph Rubber Co.*, 152 N.L. R.B. 496 (1965) and *Mitchell Standard Corp.*, 140 N.L.R.B. 496 (1963)).

We believe it follows that if a good faith doubt as to the union's majority status is sufficient to relieve the successor employer from the obligation to bargain notwithstanding a certification election, *a fortiori* it will relieve a successor from the obligation not to challenge a union's status for the duration of a contract which it is not required to assume. Accordingly, we hold that Pick's status as a successor employer did not relieve it from the duty to bargain with a union which had a presumptive majority because of the pending contract, but that Pick was entitled to refuse to bargain if it had a reasonable good faith doubt of the Union's majority.

Pick argues that the presumption of majority status, which is the *sine quo non* of its obligation to bargain, cannot support the order to bargain in this case both because the contract on which it is based was un-

---

**5.** See Note, *The Bargaining Obligations of Successor Employers*, 88 Harv.L.Rev. 759, 762–64 (1975).

lawful at its inception and because it has shown that it had a good faith doubt as to the majority status of the Union at the time it refused to bargain. These arguments are related factually because they both rely on the circumstances surrounding the inception of the relationship between the Union and the predecessor employer. The first argument asks us to give operative effect to the events that occurred in 1975 by holding that they prevented, *ab initio*, the presumptive majority status from ever arising; the second argument is directed to the extent subsequently acquired information regarding the 1975 events can be used in a later period.

 The factual findings of the ALJ in this case confirm the illegality of the original contract. The ALJ found that "[t]he Union and MLH reached substantial agreement on the terms of their collective-bargaining agreement by April 22, 1975, 6 to 7 weeks before the Mt. Laurel Hilton Inn began operations and about two weeks before MLH had hired any employees at those facilities." By granting bargaining status to an agency that had not been selected by any of its employees, much less a majority of such employees, MLH violated section 8(a)(1) and (2) of the NLRA by abridging the employees' right to bargain collectively through representatives of their own choosing and by contributing support to a labor organization. *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737–738, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); *accord, NLRB v. Local 103, International Association of Bridge, Structural & Ornamental Iron Workers (Iron Workers)*, 434 U.S. 335, 344, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). Furthermore, the ALJ found that MLH "from May 1975 until February 9, 1977, regularly required new employees, *at the time of employment*, to execute an application for membership in the Union as well as a union dues checkoff authorization card." (emphasis added). Although these were not activated until the expiration of 30 days from the date of execution, the ALJ recognized the illegality of such a procedure. The NLRA allows the employer to require membership in the union as a condi-

tion of employment only "on or after the thirtieth day following the beginning of employment . . .." 29 U.S.C. § 158(a)(3). The Board has held that requiring applicants for employment to sign applications for union membership and dues checkoff authorizations before commencement of their employment, despite a contract which gave them the grace period allowed them by the Act, is unlawful assistance in violation of NLRA section 8(a)(2) and (1). *Luke Construction Co.*, 211 N.L.R.B. 602, 603 (1974).

Pick argues that a presumption of continued majority status cannot arise out of an illegal prehire agreement. Pick construes the Board's decision in *R. J. Smith Construction Co.*, 191 N.L.R.B. 693 (1971), *enforcement refused sub nom. Local 150, International Union of Operating Engineers v. NLRB*, 480 F.2d 1186 (D.C.Cir. 1973), as holding that even when the execution of a prehire agreement is legal, as it is in the construction industry pursuant to section 8(f) of the Act, the section 8(f) agreement does not give rise to a presumption of majority. Therefore, according to Pick, it follows that no such presumption can arise if the prehire agreement was illegal. The General Counsel disputes Pick's interpretation of the law with respect to the effect of prehire contracts in the construction industry, arguing that courts have held that where a section 8(f) agreement is followed by the operation of a union security clause, a rebuttable presumption of majority arises, citing, *inter alia, NLRB v. Irvin*, 475 F.2d 1265 (3d Cir. 1975) and *Iron Workers, supra*. However, the General Counsel does not meet directly Pick's contention that a presumption of continued majority status cannot arise from an illegal prehire agreement. Instead it contends that Pick is precluded from making this argument because the section 10(b) limitation period bars the company from attacking the presumption of majority which arose more than six months earlier. This is the same position taken by the ALJ who ruled, "I have rejected Pick's contention that the circumstances surrounding the execution of that contract in 1975 could now be used to attack its validity."

The Board did not expressly comment on the ALJ's position on this issue, but construed the section 10(b) limitation period as effecting a total exclusionary bar which precluded Pick from relying on the circumstances surrounding the initial recognition by MLH as a basis to support a reasonably based doubt of majority status.

## IV.

Section 10(b) of the NLRA provides, in part, that:

> no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . ..

29 U.S.C. § 160(b). In *Local Lodge No. 1424, International Association of Machinists v. NLRB (Bryan Manufacturing Co.),* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), the Court interpreted this section as precluding not only the filing of an unfair labor charge based on the execution of a contract more than six months before filing the charge, but also the filing of a charge based on continued enforcement of that contract during the six month period. The Court noted that Congress enacted section 10(b), in part, "to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused.'" *Id.* at 419, 80 S.Ct. at 828, citing H.R.Rep. No. 245, 80th Cong., 1st Sess., p. 40. Therefore, the Court used the same considerations to hold "a finding of a violation which is inescapably grounded on events predating the limitations period is directly at odds with the purposes of the § 10(b) proviso." *Id.* at 422, 80 S.Ct. at 829.

While the literal language of section 10(b) applies only to the filing of complaints with the Board, the Board and courts have used the reasoning of the *Bryan* case to extend the section to prevent defense of an unfair labor charge based exclusively on conduct which occurred in the pre-10(b) period. *NLRB v. Tragniew,* 470 F.2d 669, 673 (9th Cir. 1972); *NLRB v. District 30, United Mine Workers of America,* 422 F.2d 115, 122 (6th Cir. 1969), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2173, 26 L.Ed.2d 543 (1970); *Bender Ship Repair Co.,* 188 N.L.R.B. 615, 627 (1971). At oral argument, Pick conceded that the *Bryan* decision precludes it from relying on the illegal prehire agreement, in itself, to defend its refusal to bargain. It argues that the agreement, when coupled with the continuing illegal assistance, is relevant.

If, as the General Counsel contends, the *Bryan* decision means that employers cannot consider any events which occurred beyond the section 10(b) period for any purpose, then our inquiry would be at an end. The ALJ's finding that Pick failed to establish that it had reasonable grounds based on objective considerations for believing that the Union did not enjoy majority support at the time of its refusal to bargain with the Union is probably supported by substantial evidence if the events surrounding the inception of the Union-MLH relationship and the unlawful assistance beginning at that time and carried over into the 10(b) period are disregarded. However, the Court itself in *Bryan* expressly provided for a contrary construction of section 10(b). It noted that in certain circumstances "earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose section 10(b) ordinarily does not bar such evidentiary use of anterior events." 362 U.S. at 416, 80 S.Ct. at 826. Therefore, we agree with Judge Gerry who noted in his opinion on the injunction request that even if Pick could not use pre-10(b) evidence to nullify the contract, there is no reason why Pick should not be permitted to admit the evidence "surrounding the 1975 contract's inception to shed light upon its refusal to bargain, as background evidence buttressing respondent's analysis of the various timely events which allegedly gave rise to its good faith doubt of majority status." *Hirsch v. Pick-Mt. Laurel Corp.,* 436 F.Supp. at 1355.

Such a result is highly compelling when the party which seeks to refer to the earlier period is a successor who was not involved in those events. Unlike the original employer, it was not a party to the agreement; the considerations which may have caused the predecessor to accept a bargaining relationship with a minority union may not be known to it; and it had no prior opportunity to raise a good faith doubt during the six months following the events in question. As the Supreme Court has noted, "[I]n light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 256, 94 S.Ct. 2236, 2240, 41 L.Ed.2d 46 (1973).

If section 10(b) were applied to a successor in precisely the same form and to the same extent as it may apply to the predecessor, the rationale of the *Burns* case would be undercut. In holding that a successor does not stand in exactly the same shoes as its predecessor because it will not be bound to the previously bargained for terms, the Court construed the relevant policies to prevent imposing on the successor an obligation to be bound by past events and arrangements. If the successor is not bound by the employer's past contract, no valid reason exists why it should be bound not to refer to the employer's past actions.

When there has been no change in the employer, application of the six month rule in the context of the presumption of continued majority status arising from voluntary recognition clearly carries out the congressional policy of protecting existing relationships. That policy cannot be fully served where there is a successor employer, who never had an existing relationship with the Union and who is free to reject the embodiment of that relationship as reflected in the contract.

Although we are not aware of any appellate court case that has analyzed the effect of the section 10(b) limitation period on a successor's ability to defend a refusal to bargain charge, the issue did arise in *NLRB v. Tragniew, Inc.*, 470 F.2d 669, 673 (9th Cir. 1972), where the court held that the successor employer was not barred from introducing evidence "as to the manner in which [the Union] obtained and operated under its collective bargaining agreement." The court agreed with the employer's contention that "Section 10(b) does not bar all evidence of events outside the statutory six-month period, which bears upon lack of majority representation within that period." *Id.*[6]

Even when the employer was not a successor, pre-10(b) evidence has been held relevant when it was offered along with other evidence of the company's good faith doubt about the majority status of the union. In *NLRB v. Dayton Motels, Inc.*, 474 F.2d 328, 333 (6th Cir. 1973), the court held:

Thus, these earlier events may be utilized to shed light on what occurred within the limitation period. In the present case these events were admissible as background evidence reflecting on the mental attitude or good-faith doubt of the Company officials that the Union ever represented a majority of its employees. In no way does this constitute an attack on the validity of the expiring agreement or on the presumption created thereby, which attack was barred by Section 10(b) of the Act. All that is shown is that the circumstances surrounding the agreement gave the Company good reason to believe that the Union never did represent the uncoerced choice of a majority of its employees. The fact that this evidence could have been the basis of an unfair labor practice charge in 1967 is coincidental and ought not to render the

---

**6.** The General Counsel relies on *NLRB v. Denham*, 469 F.2d 239 (9th Cir. 1972), decided by the Ninth Circuit several months after the *Tragniew* decision. In that case the court held that events before the section 10(b) limitation period were inadmissible in consideration of the issue of good faith doubt. *Id.* at 245. However, in the same case, the court did refer to evidence regarding the original recognition of the union thirty years prior to the hearing. *Id.* at 243–44. Thus, at the most, the decision is equivocal precedent for either of the parties.

evidence inadmissible for another purpose. (footnote omitted).

· The Board itself has considered evidence of a prehire contract executed before the 10(b) period "as background for the purpose of throwing light on events which fell within the period." *Sweater Bee by Banff, Ltd.*, 197 N.L.R.B. 805 (1972), *enforcement granted, N.L.R.B. v. Sweater Bee by Banff, Ltd.*, 486 F.2d 1395 (2d Cir. 1973). The General Counsel's reliance on *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293 (9th Cir. 1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979), is misplaced. Although the court there did state that section 10(b) precluded the employer from showing the union was in the minority, the facts were substantially different from those here. The employer was not a successor, a series of contracts beyond the original one had been ratified, there was evidence that the union's majority had already been established once, and the employer did not promptly take the action which the court deemed most appropriate for resolving majority disputes, i. e. filing a petition for election. In contrast, in this case, Pick did request a membership election contemporaneously with its refusal to bargain promptly after it took over as a successor employer.

In proffering its defense of good faith doubt of the union's majority status, Pick contends that it could reasonably consider the pre-10(b) circumstances because the "sweetheart" relationship evidenced by the prehire contract sheds light on events within the limitations period. Specifically, Pick refers to MHL's practice of requiring union membership and dues checkoff as a condition of employment which was an independent unfair labor practice occurring as to new employees hired within the six-month period. As such, it could serve to provide the relevant temporal anchor to which consideration of the prior events could be tied. We note, however, that Pick's brief does not

make clear the relationship, if any, between the unlawful assistance during the 10(b) period and its claim of good faith doubt. This issue was not previously considered by the Board and we believe it is best left to the Board's consideration in the first instance.

Because we believe that the Board erred in applying a total exclusion to evidence from the pre-10(b) period, we remand the case to the Board in order to give it an opportunity to reconsider the ALJ's finding that Pick did not have reasonable grounds based on objective considerations for believing that the Union did not enjoy majority support at the time Pick refused to bargain.

For some purposes in this case, the date from which the six-months limitations period should be measured may be critical. The General Counsel argues, and the ALJ apparently agreed, that the benchmark date for exclusion of evidence was March 4, 1977, when the unfair labor practice charge was filed. If the General Counsel is correct, the evidence available to an employer to show its good faith doubt could be severely restricted by a delay in filing a charge. This seems a questionable construction of section 10(b). Pick argues that when, as here, the statute is not being given its literal application to the filing of an unfair labor practice charge, but is being used to bar evidence used in defending an unfair labor practice charge, the six-months period should be measured from the time of Pick's refusal to bargain.[7] The reasons for using the date of the filing of the charge rather than the date ·of the refusal to bargain were not developed by the ALJ and should be considered further by the Board on remand.

For the foregoing reasons, we will deny enforcement of the Board's order and remand the case for further consideration consistent with this opinion.

---

**7.** We recognize that Pick has not produced specific evidence of the number of employees who were tainted by the coercive practices within six months of the date of its refusal to bargain. We question whether evidence of a tainted majority is necessary in this case where

Pick seeks to use the fact of unlawful assistance only in conjunction with other evidence, such as expressions of employee dissatisfaction, to show good faith doubt, and not the actual minority status of the Union.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

We are asked to consider in this case the relevance of certain events which occurred almost two years prior to the six-month statute of limitations period of Section 10(b) of the National Labor Relations Act. I agree with the first part of the majority's decision which holds that Local 170, Bartenders, Hotel, Motel and Restaurant Employee Union, AFL–CIO (the Union) continues to enjoy a presumption of majority status within the six-month period of 10(b). Although there was illegal recognition of the Union prior to the hiring of employees, Section 10(b) precludes raising after six months this unfair labor practice as a basis for eliminating the presumption of minority status. I cannot agree with the majority that the same evidence of illegal recognition (two years earlier) must be considered to help rebut that presumption once established; and that the failure of the National Labor Relations Board (the Board) to consider this evidence was contrary to Section 10(b) and reversible error. The Board's decision is entirely consistent with the underlying purposes of Section 10(b) to further labor stability and with the Supreme Court's decision in *Local Lodge No. 1424, International Association of Machinists v. NLRB (Bryan Manufacturing Co.)*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). While I would uphold the Board's decision to consider such evidence under its discretion to evaluate the probative value of evidence, I would not, as the majority does, require that they do so. Without this evidence, there clearly is substantial evidence to support the Board's conclusion that the employer lacks a good faith doubt of the Union's majority status.

The Board's order should be enforced.