**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WEST SAND AND GRAVEL COMPANY, and Wrentham Sand and Gravel Company, Divisions of S. M. Lorusso & Sons, Inc., Respondents.**

**No. 79–1054.**

United States Court of Appeals, First Circuit.

Argued Sept. 6, 1979.

Decided Dec. 19, 1979.

---

Barbara G. Gehring, Washington, D.C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Allison W. Brown, Jr., Washington, D.C., were on brief, for petitioner.

Alan I. Kaplan, Boston, Mass., with whom Philip J. Moss, William F. Joy and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief for respondents.

Before KUNZIG,* Judge, U.S. Court of Claims, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board (NLRB) petitions for enforcement of an

* Sitting by designation.

order issued December 20, 1978, against West Sand and Gravel Co. and Wrentham Sand and Gravel Co., divisions of S. M. Lorusso & Sons, Inc., a Massachusetts corporation. The Board charged respondents West and Wrentham with violations of Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(5),[1] on the ground each respondent unlawfully withdrew recognition from and refused to bargain with Local 4 of the International Union of Operating Engineers during and after the term of a collective bargaining agreement between the company and the union. The Board, affirming and adopting the opinion of an administrative law judge, determined that respondents had committed the unfair labor practices as charged and entered a Section 8(a)(5) bargaining order against the two companies.

### 1. The Issues

■ The National Labor Relations Act imposes on an employer a duty to bargain collectively with a union selected by a majority of the employees in a unit appropriate for such purposes. 29 U.S.C. §§ 158(a)(5), 159(a). An employer has no duty, however, to recognize or bargain with a union representing only a minority of such employees—indeed, to do so would be an unfair labor practice. *International Ladies Garment Workers' Union [Bernhard-Altmann Texas Corp.] v. NLRB*, 366 U.S. 731, 737, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); 29 U.S.C. § 158(a)(2). Accordingly, when charging an employer with an illegal failure to bargain, the Board must make an adequate showing that the union represents the choice of a majority of employees in an appropriate bargaining unit. *See, e. g., NLRB v. Dayton Motels, Inc.*, 474 F.2d 328, 331 (6th Cir. 1973); *Maphis Chapman Cor-*

*poration v. NLRB*, 368 F.2d 298, 302–03 (4th Cir. 1966).

■ To establish Local 4's majority status at the time of the refusal to bargain, the Board relied on a presumption of majority status said to have arisen from the employers' past voluntary recognition of the union and a series of collective bargaining agreements dating back to the 1950's. We have heretofore recognized a presumption of this variety, *NLRB v. Crimptex, Inc.*, 517 F.2d 501, 503 n.2 (1st Cir. 1975), and have said that "An employer who wishes to stop bargaining with a union which has been voluntarily recognized must overcome the same rebuttable presumption applied when the union is a certified one." *Id.* at 503 n.2.

Respondents, however, vigorously deny that the facts here could have created such a presumption of majority status. While they admit to a previous relationship between themselves and Local 4, they point to Board precedent holding that a presumption of majority status does not arise if the prior bargaining agreements were unclear in the description of the relevant unit or if the parties had not maintained a true collective bargaining relationship. *See Glenlynn, Inc.*, 204 NLRB 299 (1973); *Bender Ship Repair Co., Inc.*, 188 NLRB 615 (1971); *Ace-Doran Hauling & Rigging Co.*, 171 NLRB 645 (1968). Major defects of this type are said to have infected the relationship with Local 4.

Respondents further contend that even if the prior relationship was sufficient to give rise to a presumption of majority status, they have rebutted it both with clear and convincing evidence of lack of a majority and with a showing of an objectively based good faith doubt that the union actually

---

**1.** Section 158(a) states:

"It shall be an unfair labor practice for an employer—

    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.    .    .    .    .

    (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

Section 159(a) states:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . .."

represented a majority of employees at the time recognition was withdrawn. *See NLRB v. Randle-Eastern Ambulance Service, Inc.,* 584 F.2d 720, 727–29 (5th Cir. 1978); *Pioneer Inn Associates v. NLRB,* 578 F.2d 835, 839 (9th Cir. 1978).

### 2. The Facts

West Sand and Gravel Co. (hereinafter sometimes "West") and Wrentham Sand and Gravel Co. (hereinafter sometimes "Wrentham") are divisions of S. M. Lorusso & Sons, Inc., a loosely structured corporation engaged in various operations involving the extraction and processing of stone and sand. One cluster of Lorusso & Sons' activities occurs at the Wrentham quarry (an operation distinct from Wrentham Sand and Gravel Co., which is located elsewhere in the same town). At the Wrentham quarry solid rock is first blasted by independent contractors, and then processed into crushed stone with equipment operated by Lorusso employees including, on occasion, unit personnel brought in from West Sand and Gravel or Wrentham Sand and Gravel. Most of the crushed stone is sold directly to customers, and because the market for crushed stone from the quarry is primarily composed of construction contractors, the business is highly seasonal, with an annual winter shutdown. During shutdowns, employees from the quarry work in other operating divisions.

A second cluster of activities concerns the processing of stone extracted mainly, though not exclusively, from the Nardones Gravel Pit in Franklin, Massachusetts, which is partly owned by Lorusso & Sons. Gravel is brought from this or, on occasion, other gravel pits [2] to one of three processing plants owned and operated by divisions of the company: West Sand and Gravel Co. located in Walpole, Massachusetts; Wrentham Sand and Gravel Co. located in Wrentham, Massachusetts; and Norfolk Sand and Gravel Co. located in Norfolk, Massachusetts. After the stones and gravel are crushed, sorted, and washed at one of these places, they are transported to customers in trucks also owned and operated by Lorusso & Sons. These trucks are stored and maintained at two garages, one in Walpole about one-fourth of a mile from the West plant and one on the premises of the Wrentham plant. (The drivers of these trucks are represented by another union and are not relevant to this case.)

Continuous relations with Local 4 have existed since the 1950's at Lorusso's West plant, and since the 1960's at its Wrentham plant. The ALJ could find no evidence the NLRB ever certified the union at either location or that any union election—official or unofficial—was ever held. The record does show, however, a series of collective bargaining agreements between the union and West and the union and Wrentham dating back at least to 1967. Testimony at the hearing held before the ALJ showed that until 1975 the parties had renewed these agreements at three-year intervals simply by mailing the contracts back and forth. In 1975, an industry-wide strike by the International Union of Operating Engineers prompted officials of Lorusso & Sons to insist on face-to-face negotiation of subsequent contracts, and two one-year contracts were concluded in this manner.

Identical clauses in both the West and Wrentham agreements describing the bargaining units have been unchanged since at least 1967. The description in contracts between the union and West Sand read as follows:

> "This agreement covers only engineers of West Sand and Gravel Company operating power shovels, cranes, shovel-dozers, bulldozers, front end loaders, other power loading equipment and plant operators, mechanics and welders in its crushed stone quarries."

Except for the words "Wrentham Sand and Gravel Company," the unit description in the Wrentham contracts was the same. Although the parties strenuously dispute the

---

**2.** The ALJ found that some crushed stone from the Wrentham quarry is also processed at the company's gravel plants.

scope of these unit descriptions, it is agreed they do not cover, and were never intended to cover, employees at Norfolk Sand and Gravel Company or at any of Lorusso & Sons' other operations not herein described.

The ALJ found that, in practice, employee assignments were not always maintained within the organizational boundaries described above. Because of the coordination required between the extraction of stone and gravel at the source and the processing operation, and because of the seasonal nature of the business, the ALJ found that:

> "the Company adopted a policy of shifting employees around, bringing workers from the Quarry or the Pit to West or Wrentham to operate equipment when demand was high, and moving employees from the Union's bargaining units at West and Wrentham from one unit to the other and even into the non-union operations at the Pit or the Quarry."

In addition to these "casual and sporadic" transfers, as the ALJ termed them, at times non-union personnel were assigned to do bargaining unit work at either West or Wrentham on a more permanent basis as replacements for union members. The ALJ also acknowledged that one employee, John Zahner, whose normal assignment was at West doing the same work as members of the asserted bargaining unit, was not covered by the West contract, and never received benefits under it.

The ALJ made the following findings with respect to the bargaining history between the parties. In 1975, six of the employees of West and Wrentham were members of Local 4. At West they were Ernest Crognalo, loader operator, Joe DiPietro, general maintenance, Andy Kushnir, welder, and Richard DiPlacido, plant operator. At Wrentham they were Ken Hickerson, plant operator, and Jim McCusker, loader.

Only these six were provided with contract benefits. Following the industry-wide shutdown in 1975, union agents William O'Keefe and Walter Ryan met with the Lorusso brothers—Antonio, Jim, and Sam—for a wide-ranging discussion of the various Lorusso operations and the issue of who was covered under the contracts. This discussion resulted in an agreement that the contract would continue to apply only to these six union members and their replacements.[3] The parties further agreed that DiPietro would retire and not be replaced, leaving a total of five workers covered by the two contracts.

At the time of the 1976 negotiations, two of the five union members were out of work due to heart attacks. Crognalo was expected to return to work, and the company was continuing to pay his salary in the interim. His temporary replacement was a non-union employee from the gravel pit, Bruce Hunchard. Kushnir was not expected to return, and the question of his replacement was left open. During the term of the 1976–77 agreement, the bargaining units experienced further turnover. Although Crognalo returned to work after a year, Kushnir did not. A new employee, John Hart, was hired to replace Kushnir as the welder at West; the record indicates that Hart applied to join the union. The parties later agreed that Hart was covered by the contract. Late in 1976, the plant operator at West, DiPlacido, suffered an injury that left him disabled to perform the duties of plant operator. He was shifted to general maintenance at West and replaced by a non-union employee named Paul Benson. Finally, in the spring of 1977, the plant operator at Wrentham, Ken Hickerson, was killed in a motorcycle accident. His non-union replacement was Paul Zahner, the

---

**3.** Testimony at the hearing differed radically regarding the import of this agreement. Company president Antonio Lorusso maintained this agreement reaffirmed what he called the "five-man deal." The essence of this arrangement, according to Lorusso, was that the union would be content with representing only certain named individuals and would not attempt to assert jurisdiction over other Lorusso employees. Union business representative William O'Keefe denied any such "sweetheart" arrangement, contending the union at all times sought to represent all employees of West and Wrentham. He testified that it was his belief that the six employees who were discussed in the 1975 meeting constituted the basic workforce of the two plants.

brother of John Zahner who worked at West. At all times relevant to this action the contracts contained a union security clause requiring new employees to join the union within 31 days of starting work.[4]

In the spring of 1977, according to the ALJ's findings, union agent O'Keefe first raised with the employer the question whether the Zahner brothers, Benson, and Hart would be covered by the contract and required to join the union. As noted earlier, the parties did reach an agreement that Hart, who had applied for union membership, would be covered. At a meeting on July 15, 1977, the Lorusso brothers informed O'Keefe and Ryan they were reluctant to pay the regular journeyman rate to Benson and the Zahners, supposedly because they were not experienced men. (In fact, John Zahner had worked at West since 1971). The union responded by proposing a "secondary plant rate" for these three men. The company agreed in principle, proposing a $6 per hour figure. The union asked for $7. During the course of discussions, the parties agreed to drop John Zahner from consideration on the purported ground that he was shifted from one location to another and did not belong in the unit. At a later meeting, a tentative agreement was reached on this basis, subject to approval by Sam Lorusso, who was not present. The ALJ credited the testimony of union agent O'Keefe that when Sam Lorusso returned, he met with the union representatives to tell them their contract demands constituted "too much money."[5] The company admitted in its answer to the Board's complaint that it withdrew recognition from and refused to bargain with the union from July 31, 1977 onward. In November, subsequent to the filing of unfair labor practice charges by the union, the company filed so-called "RM" petitions with the NLRB questioning the majority status of the union. These petitions were dismissed on the ground that issuance of the complaint in this case precluded consideration of the petitions. The record does not contain any indication that the company had questioned the union's majority status prior to filing of the RM petitions.

### I.

Respondents claim the Board did not meet its burden of proving that the union here was supported by a majority of the employees in an appropriate unit. The Board replies that it properly applied the presumption of majority status arising from the collective bargaining agreements between the parties. *See Pioneer Inn Associates v. NLRB*, 578 F.2d 835, 838 (9th Cir. 1978). This presumption, similar in scope and purpose to the contract bar rule applied by the Board to prevent decertification elections during the life of a labor contract, is meant to serve the policy of ensuring stability in collective bargaining relationships. The Board itself has acknowledged, however, that the goal of stability cannot be allowed to preempt other important labor policies. Thus the Board has held that where the contractual bargaining unit is ambiguous and where no real collective bargaining relationship is found, majority status will not be presumed. *Ace-Doran Hauling & Rigging Co.*, 171 NLRB 645 (1968); *Bender Ship Repair Co., Inc.*, 188 NLRB 615 (1971); *Glenlynn, Inc.*, 204 NLRB 299 (1973). The goal of stability was subordinated in these cases to the policy that an employer's recognition of a minority union, or a union that does not fairly represent the employees in a proper unit, should not be enshrined by a Board order compelling continued bargaining with such a union.[6]

4. The union security clause read as follows: "The Employer agrees that on occasion of need for such labor, it shall notify the Local of the need for qualified workmen in the classifications within its craft jurisdiction. Qualified workmen procured by the Employer from other sources shall apply for and become members of the Local on or after the 31st day from the date of employment."

5. According to O'Keefe, Lorusso's statement was, "Take your people and we're not interested. It's too much money."

6. In these cases, it was the employer—as here—who, after having dealt with the union for some period, repudiated the relationship. (Only in *Glenlynn* was there evidence of *employee* dissatisfaction with the representation.) At first blush it might seem that the employer

Respondents West and Wrentham argue that the evidence adduced at the hearing in this case "conclusively establishes both that the bargaining unit is ambiguous and that its bargaining relationship with the Union is a sham." Since the Board has held in the past that such conditions void the presumption of majority status, respondents argue the Board should be barred from applying the presumption to this case.

## II.

To review this argument it is necessary first to examine the Board's precedents and then to turn to the ALJ's analysis of the present facts. In *Ace-Doran*, the first of the cited Board decisions, there were six contracts covering some but not all of the employer's 22 terminals. The Board held the contracts failed to define the included unit with sufficient clarity "to warrant a finding that the contracts are ones to which a presumption of majority status can attach." 171 NLRB at 645. The Board said a presumption of majority status "obviously" cannot attach to a contract "if in fact the boundaries of the unit in which a majority must exist are not defined." A second factor also undermined the presumption:

"The evidence relating to the practice under the agreements further makes it clear that the parties did not intend them to be effective collective bargaining contracts, but instead merely regarded them as arrangements under which Respondent agreed to check off dues, health and welfare, and pension payments for union members only. The acquiescence of the Unions in Respondent's failure both to enforce the union-security provisions of the agreements and to pay health and welfare contributions for all employees (as ostensibly provided by the 'contracts'), makes it clear that the parties did not believe that they were in true collective-bargaining relationships."

*Id.* at 646. The Board's bottom line conclusion was that the alleged agreements were not such as to give rise to a presumption of majority status, and that the General Counsel had failed in the section 8(a)(3) proceeding to sustain his burden of proof as to majority status.

In the second Board case respondents cite, *Bender Ship Repair Co., Inc.*, 188 NLRB 615, the Board noted a "patent ambiguity" in the contractual unit definition because the contract purported to cover all production and maintenance employees while the wage scale applied only to boilermakers. The Board further observed in that case that "the question of unit [was not] resolvable by the manner of applying the contract." Company officials testified that the contractual benefits were applied only to some union members and other favored employees, the Board noted.

"Even if, as the Trial Examiner found, this contract was not on its face, or in practice, a contract covering only union members, or only union members in ship repair, we find that it was otherwise defective in creating or perpetuating a true collective-bargaining relationship. We reach this conclusion because the unit defined is ambiguous in scope—purporting to cover a production and maintenance unit while continuing a wage scale limited to boilermaker employees—and because it was applied, as in the case of earlier contracts in evidence, to ignore

should not be allowed to challenge the *bona fides* of a bargaining representative with whom in the past it has voluntarily dealt. *Compare Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 490 (2d Cir. 1975) (Board can strike policy balance differently where employer asserts rights of employees rather than rights of his own). But the Board apparently believes that it would be improper for it to compel—merely on the basis of a presumption—the continuation of a bargaining relationship that did not measure up to the fundamental standards of

the national labor laws. The Board, to be sure, has acquiesced in the perpetuation of voluntarily established units, the boundaries of which would not have satisfied criteria applicable to Board-established units. *See, e. g., International Telephone and Telegraph Corp. v. NLRB*, 382 F.2d 366, 369–70 (3d Cir.), *cert. denied*, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1967). But it is another matter to enforce a formerly voluntary bargaining relationship founded on minority representation, discriminatory representation, or some similar grave impropriety.

contract benefits except for a few favored employees."

*Id.* at 616.

In the final case of the trilogy, *Glenlynn, Inc.,* 204 NLRB 299, the Board adopted the ALJ's findings and conclusion that the contracts did not support the majority status presumption, citing *Ace-Doran* and *Bender Ship.* The ALJ found that the union had not attempted to enforce the union security clause, and that health and pension benefits had been restricted to a few chosen employees. *Id.* at 302–03. When the union did try to require employees to join, several employees filed a deauthorization petition seeking to have the union security clause deleted from the contract. The ALJ also found the unit definition ambiguous because it was not clear whether the unit involved in the case had merged with another unit at a separate location. "Apart from the ambiguity thus surrounding the scope of the bargaining unit," the ALJ said, "the evidence leaves one highly skeptical that a real collective-bargaining relation-

ship emanated from the execution of the . . . contracts." *Id.* at 309.[7]

### III.

We agree with respondents that the ALJ failed to give proper weight to the Board's holdings in *Ace-Doran* and its progeny.[8] We find particularly unconvincing his attempt to distinguish *Ace-Doran* on the ground that the present case does not involve an ambiguous unit description.[9] The ambiguity here is no less evident than that which troubled the Board in *Ace-Doran.* There, it could not be said which of the employer's 22 terminals were covered by the six contracts. It was thus impossible to determine accurately the scope of the unit in which a majority was supposed to exist. Here, the contractual unit descriptions, if read literally, are virtually unintelligible. At West Sand, for example, the description appears to encompass all engineers operating heavy equipment at the plant, but only plant operators, mechanics and welders at "crushed stone quarries." By implication, engineers at the quarry, and plant opera-

---

**7.** In *Pioneer Inn Associates,* 228 NLRB 1263 (1977), *enforced,* 578 F.2d 835 (9th Cir. 1978), the ALJ declined to apply the presumption of majority status, relying on *Ace-Doran* and *Bender Ship.* The Board reversed. The ALJ's determination rested on a finding that the contract itself was valid, but that the union had abandoned any effort to enforce the contract for more than four years. The Board said this finding was not analogous to the past cases. "The contracts in both [*Ace-Doran* and *Bender Ship*], which were offered as establishing presumptions of majority status, were found defective as being 'members only' agreements or at least as having been applied discriminatorily, and indefinite as to unit coverage, and thus neither would be a bar in the Board's representational context." 228 NLRB at 1264. Thus, the Board found "the lack of any basis for finding the contract to be invalid calls into effect the long-established Board presumption of the Union's majority status." *Id.*

**8.** While the Board is not required to adhere slavishly to principles adopted in prior cases, *see, e. g., NLRB v. Weingarten, Inc.,* 420 U.S. 251, 265–66, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); *NLRB v. Wentworth Institute,* 515 F.2d 550 (1st Cir. 1975), where such principles are not expressly disavowed or overruled, the Board may not simply ignore them, or distinguish them away on meaningless grounds. *See*

*Atchison, Topeka & S. F. R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 805–09, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (plurality opinion); *Local 814, International Brotherhood of Teamsters v. NLRB,* 167 U.S.App.D.C. 387, 394, 512 F.2d 564, 571 (D.C. Cir. 1975) (Bazelon, J., concurring in part and dissenting in part); *NLRB v. Silver Bay Local Union,* 498 F.2d 26, 29 (9th Cir. 1974); *NLRB v. International Union of Operating Engineers, Local 925,* 460 F.2d 589, 604 (5th Cir. 1972).

**9.** Noting that the cases in the *Ace-Doran* trilogy were "not really much help," the ALJ distinguished them on the following grounds. Unlike *Ace-Doran,* he said, the present case does not involve an ambiguous unit definition. "[T]he contracts clearly define the unit covered, despite the fact that other non-unit employees performed unit work, as I have found, with one single exception, on a sporadic or casual basis." *Bender Ship* and *Glenlynn* were distinguished on the basis that in neither case was any evidence presented indicating that the union represented a majority of employees at any critical date. "In this case," the ALJ said, "the Union retained its majority in the West unit until at least the time that Kushnir retired [May 1977] and at Wrentham until the death of Hickerson [spring, 1977]."

tors, mechanics and welders at the Walpole plant, would not be part of the unit. The record contains no evidence explaining the intent of the parties who drafted this description, or identifying the contours of the unit they originally had in mind. The ALJ was clearly mistaken in characterizing this description as "clear cut and precise." [10]

While the ALJ obviously misspoke insofar as he termed the express unit description clear, or even intelligible, we agree with Board counsel that there may be cases where the express unit description contained in a contract is unclear, yet where the parties are shown to have a definite, and not unreasonable, understanding of what constitutes the bargaining unit. In those circumstances, if the parties have historically dealt with each other on the basis of bona fide collective bargaining, it might not be unreasonable, or inconsistent with Board precedent, for the Board to rely on a presumption of majority status arising from such an implicit understanding as to the contours of the unit. Thus we must proceed to ask whether, despite the patent facial ambiguity of the unit description, there is substantial evidence that the parties here, in practice, contemplated some other, more objectively defined unit in which a majority clearly existed—or whether, like the parties in *Ace-Doran* and *Bender Ship*, they permitted their indefinite unit description to cloak a practice of restricting contract benefits to a select group of employees.

The ALJ inferred from the parties' bargaining history that they had a definite understanding as to the membership, at least, of the bargaining units.

"Where the parties have negotiated for years and have not seen fit over those years to modify the unit description, even though there is not the slightest suggestion in the record that either of them ever entertained a notion that the Wrentham Quarry was included in either unit, much less in both of them, it is evident that the inclusion of references to 'stone quarries' in the unit description are [sic] merely inadvertent."

Since the "stone quarries" language was, so the ALJ thought, "inadvertent," he looked to the actual practice of the parties under the contract to see how it had been interpreted. In practice, he found, employees at the quarry, as well as truck mechanics and certain other miscellaneous employees, had been excluded from the parties' bargaining and from the benefits of the collective bargaining agreements. Since the employer could not establish that any of these employees were *necessarily* included within the bargaining units, the ALJ determined that the units as to which the employer had previously bargained, i. e., the "permanent" employees at the West and Wrentham plants, were the appropriate ones.[11] Board counsel urges this position on appeal, as well:

"Here, the Company is attempting to repudiate the agreements to which it has been a party for approximately 20 years, by arguing that the unit descriptions in the contracts are ambiguous. . . . In essence, the Company argues that the language used in the agreements *requires* the inclusion of all mechanics and Quarry employees in the bargaining units." (Emphasis added.)

The Board argues the ALJ correctly rejected the company's position since he found no intent to include the quarry employees and the truck mechanics in the bargaining units.

---

10. Not surprisingly, the record shows the contract was never interpreted as covering the hybrid, and most likely inappropriate, unit the literal language seems to describe. At all relevant times *some* plant operators, mechanics and welders at the Walpole or Wrentham plants were included in the union and were provided with contractual benefits. With only one arguable exception, *see* text at note 13 *infra*, no plant operator, mechanic or welder at the Wrentham quarry—the only "crushed stone quarry" Lorusso & Sons owned—was ever provided with the benefits of the labor contract.

11. The ALJ rejected the employer's contention that the separate units at West and Wrentham had merged through common bargaining and employee interchange. We have no occasion to pass on this finding.

We think the Board has misconstrued the employer's argument as well as the import of its own prior cases. The employer, as we understand it, does not argue that the contractual language *requires* the inclusion of mechanics and quarry employees in the unit, despite some unwritten understanding to the contrary. Rather, the employer's point is that any understanding the parties may have had was so subjective and problematic that any particular employee was left at the mercy of his employer and union to determine whether he was in the bargaining unit or not. Neither in the minds of the parties, insofar as the record shows, nor in their written agreement, was there any objective standard by which to trace the contours of the unit and determine unit membership. Each time a contract was negotiated, the parties were required to bargain on an ad hoc basis about which employees were to receive the benefits it contained. This procedure contradicted a fundamental tenet of collective bargaining, namely that workers who are similarly situated should be treated equally. As the Board's earlier decisions in this area have made clear, a reasonable degree of clarity and generality in the unit definition is required, whether the agreement is explicit or implicit, so that individual workers are not exposed to discriminatory treatment. *See Bender Ship Repair, supra,* 188 NLRB at 616; *Ace-Doran, supra,* 171 NLRB at 646.

The defect in these agreements becomes clearer when we examine the actual historic practice relied on so heavily by the ALJ in finding that the units consisted of the "permanent" employees of West and Wrentham.[12] Union business representative O'Keefe testified, and it is undisputed, that Bob Peck, who was employed during the period 1971–1975, was not permanently stationed at either West or Wrentham, and that he performed part of his work at the Wrentham quarry.[13] Yet Peck was a union member until his discharge in 1975, and he received union benefits throughout this period. At the same time, John Zahner, who *was* permanently stationed at the West plant from 1971 onward, was not required or requested to join the union (despite the union-security clause), never received union benefits, and was not bargained about until the spring of 1977. At that time, the parties agreed to *exclude* Zahner from the unit, on the ground that he moved from place to place (this, even though Peck, who in fact did roam about, had not been excluded).

Furthermore, we cannot see how the parties can be said to have maintained a true collective bargaining relationship when the ALJ's own findings show that here, as in *Ace-Doran*, the union acquiesced in "Respondent's failure both to enforce the union-security provisions of the agreements and to pay health and welfare contributions for all employees." 171 NLRB at 646.[14]

**12.** The ALJ relied entirely on the supposed agreement of the parties, evidenced by their practice, for his finding as to the appropriate units, declining to consider such factors as community of interest and employee interchange. The ALJ's own findings portray the employer's operations as highly integrated, with a significant amount of employee interchange:

"[T]he two bargaining units at West and Wrentham were coordinated in Respondent's operation with the non-union divisions at Wrentham Quarry and Nardone's Pit. . . . In these circumstances the Company adopted a policy of shifting employees around, bringing workers from the Quarry or the Pit to West or Wrentham to operate equipment when demand was high, and moving employees from the Union's bargaining units at West and Wrentham from one unit to the other and even into the non-union operations

at the Pit or the Quarry. The Company also used such employees to perform maintenance repair and plant replacement duties during slack seasons, even utilizing equipment operators to do painting and other makework stopgaps to spare the employees the hardship of layoff."

*Compare NLRB v. Campbell Sons' Corp.,* 407 F.2d 969 (4th Cir. 1969).

**13.** According to company president Tony Lorusso, Bob Peck worked primarily at the Wrentham quarry. O'Keefe testified that Peck "roamed" from location to location, including the quarry, but did not say where he was primarily stationed.

**14.** In a true collective bargaining relationship the union is expected to fairly represent all employees in the unit. *See Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842

This failure occurred not only with regard to John Zahner, but also with respect to other employees who fell within the scope of the units as defined by the ALJ. For example, it is undisputed that during 1976, union members Crognalo and Kushnir were replaced by non-union employees Bruce Hunchard and John Hart for extended periods, totaling at least a year in each case. Yet Hunchard was never asked to join the union, and Hart was not included in either unit until the 1977 negotiations.[15] Other testimony appears in the record concerning instances where employees performed bargaining unit work at West or Wrentham for considerable periods without either joining the union, as required by the union-security clause, or receiving the contractual wage-scale and other benefits. While the ALJ discounted much of this evidence by noting that the employer had failed to introduce payroll records or other evidence to corroborate his assertions of which employees did unit work,[16] we think these examples, buttressed by the testimony of John Zahner

that discrimination between union and non-union employees was "common knowledge" within the company, should at the very least have made the Board "highly skeptical" that a true collective bargaining relationship existed. See *Glenlynn, Inc.,* 204 NLRB 299, 309 (1973).

■ We thus find unreasonable the Board's reliance on the presumption of majority status in the circumstances of this case. Neither the explicit agreement nor the actual practice of the parties evidenced a clear and objective understanding of the scope of the bargaining unit or a desire to engage in genuine collective bargaining. See *Ace-Doran Hauling & Rigging Co.,* 177 NLRB 645, 646 (1968); *Bender Ship Repair Company, Inc.,* 188 NLRB 615, 616 (1971); *Glenlynn, Inc.,* 204 NLRB 299, 309 (1973). Nor was there substantial evidence on the record, see 29 U.S.C. § 160(e), to indicate that the union actually commanded the support of a majority of employees in an appropriate unit, either at the time of the

---

(1967); *Steele v. Louisville & Nashville Railroad,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). We do not mean to suggest that a showing of minor or technical violations of the duty of fair representation would automatically invoke the rule of *Ace-Doran* negating the presumption of majority status arising from an otherwise valid agreement. Where, however, as here, there is a virtually undisputed showing of significant discrimination between union and non-union employees coupled with an utterly indefinite and fluid unit description, we think it unreasonable for the Board to infer that the union truly intended a proper collective bargaining relationship with the employer.

**15.** It is true that Hunchard was considered a "temporary" replacement for Crognalo, who was expected eventually to return to work; yet, Hunchard's employment within the bargaining unit continued for far longer than the 31 days specified in the union security clause. Hart eventually applied for union membership, and was the subject of bargaining during the negotiations for a new agreement which led to the present dispute.

**16.** The Company did submit seven exhibits, consisting of lists of employees at West and Wrentham during each of the years from 1971 to 1977. Company president Antonio Lorusso testified that he compiled these lists from company payroll records and from his own memory. The parties stipulated that the exhibits

were accurate insofar as they identified which employees were members of the union, but the identification of employees by the locations where they worked, based on Lorusso's memory, was left in dispute.

The ALJ specifically found that Lorusso's testimony did not lack credibility, but he rejected Lorusso's assertions as to which employees performed bargaining unit work on grounds of vagueness and lack of corroboration. We note first of all that, contrary to the ALJ's suggestion, the payroll records probably would not have increased Lorusso's credibility on this issue, since they apparently would not have shown where any employee actually performed his work or what work he did. Second, Lorusso's testimony was not always as vague and "lacking in essential details such as percentages of time spent at various locations" as the ALJ asserted. For example, Lorusso testified, and it was nowhere contradicted, that one Pembroke was a welder and loader at West in 1971 and that he spent, that year, "80%–90% of his time" at the Walpole plant. The ALJ nevertheless excluded Pembroke from the unit. We find that the ALJ acted unreasonably in refusing to consider whether Lorusso's testimony—even if insufficient to establish what the appropriate unit was—did not at least show that the parties applied markedly inconsistent standards in determining who was or was not included in the unit.

refusal to bargain or previously. The ALJ's finding that an actual majority existed from at least 1975 to shortly before the refusal to bargain in July 1977 cannot be credited, since it rested entirely on the premise that the informal agreement of the parties established an appropriate and unambiguous unit.[17] In fact, the question whether a majority existed here at some relevant time could not be determined in any meaningful sense because the scope of the unit was so unclear.

Further, even if we accepted the ALJ's assumption that the actual intent of the parties was to include only "permanent" employees of West or Wrentham in the units, his manner of determining which employees were "permanent" was highly unsatisfactory. By placing on the employer the burden of proving that any particular employee was not excluded under the agreement, the ALJ virtually ensured that the roster of unit employees he obtained would include only union members. Thus, for example, the ALJ excluded a non-union Wrentham mechanic named Ralli who "maintained and repaired the equipment used by bargaining unit employees" but also "worked on the trucks" on the ground there was "no breakdown in his time as to how much was spent on unit equipment."[18] Other mechanics were excluded on similar grounds. The result was to ensure that, with the exception of John Zahner, whose own testimony at the hearing established that he was clearly within the West bargaining unit, no non-union employees would be counted against the union's "majority."

## IV.

Since the presumption of majority fails, and since the ALJ was unable to conclude that an actual majority of employees existed within an appropriate bargaining unit at the time of the withdrawal of recognition and refusal to bargain, we reverse the Board's findings of violations of §§ 8(a)(5) and (1) by respondents, and we refuse to enforce the bargaining orders entered by the Board.[19] We note that our judgment does not prevent the employees of Lorusso, if they desire to be represented by this, or some other, union from petitioning the Board for an election. We express no view at this time on any question concerning the appropriate unit within which such an election might take place, and nothing in this opinion should be taken as foreclosing an independent evaluation of the appropriate unit by the Board using traditional criteria. We simply hold that the Board may not compel this employer to bargain with this union where no valid finding has been made that the union represents the desires of a majority of employees in an appropriate bargaining unit.

*Petition for enforcement denied, and the order of the Board is set aside.*

**17.** The Board argues that the ALJ's approach is supported by the Board's longstanding practice of considering a unit agreed to by the parties "appropriate" unless the party resisting such interpretation shows some defect in the stipulated unit. The authorities cited by the Board, *see e. g., Blades Manufacturing Corp.,* 174 NLRB 937 (1969); *Montgomery Ward & Co., Inc.,* 123 NLRB 135 (1959), all involved stipulations for certification upon consent election entered into by the parties in contemplation of forthcoming union elections. Once elections had been held, employers in these cases were estopped from contesting the appropriateness of the unit to which they had agreed. *See Blades, supra,* 174 NLRB at 939; *see also The Baker and Taylor Co.,* 109 NLRB 245, 246 (1954). This is a far cry from suggesting that

an employer is estopped from contesting a *contractual* unit definition, no matter how ambiguous, unless he can show that some other unit is the only appropriate one possible. *Compare Bender Ship Repair Co., Inc.,* 188 NLRB 615 (1971).

**18.** It was undisputed that Ralli was permanently stationed at the Wrentham plant, where the truck garage is directly on the premises.

**19.** Given our disposition of this case, we need not consider respondents' contentions that the record contains clear and convincing evidence of the union's lack of majority status or objective evidence to support the employer's good faith doubt as to majority status.