OPINION OF THE COURT
RENDELL, Circuit Judge.
I. Introduction
This appeal presents the question whether a successor employer who has expressly refused to be bound by its predecessor’s collective bargaining agreement may nonetheless be forced to arbitrate grievances pertaining to the agreement. Because an unconsenting successor cannot be bound by the substantive provisions of its predecessor’s agreement, we hold that the successor in this case, appellee Amer-iSteel Corporation, cannot be forced to arbitrate the extent of its obligations under the agreement. AmeriSteel, quite simply, has no obligations under the agreement — and thus no arbitration award for the appellant, Teamsters Local 430, could possibly receive judicial sanction. In such circumstances, the arbitration forum designated in the collective bargaining agreement is an inappropriate vehicle by which to settle the parties’ dispute. Therefore, we will affirm the District Court’s order which enjoins the Union and the American Arbitration Association from including AmeriSteel as a party in pending arbitration proceedings, or any other arbitration proceedings involving the collective bargaining agreement.
Our resolution of this case avoids creating the incongruous situation in which a successor employer may be forced to arbitrate the extent of its obligations under its predecessor’s agreement, and yet the arbitrator is powerless to enforce these obligations because they are not binding on the successor employer. While we recognize the vital importance of arbitration as a means of settling labor disputes, we think it clear that arbitration should not proceed when ultimately it can serve no purpose. Furthermore, our decision recognizes the sound principle that arbitration cannot be used as a means to accomplish illegitimate ends. More specifically, given that AmeriSteel has no obligations under the collective bargaining agreement, any arbitration award to the appellant Union would necessarily reach beyond the agreement itself and into the realm of the arbitrator’s own notion of industrial justice, a practice expressly forbidden by the United States Supreme Court.
II. Facts and Procedural Background
Appellee AmeriSteel is a Florida corporation engaged in the manufacture and sale of steel products. On April 29, 1999, AmeriSteel purchased various assets of Brocker Rebar, including a manufacturing facility in York, Pennsylvania, and AmeriS-teel commenced operations at the York facility on May 3, 1999. Appellant Team *266 sters Local 430 (“Local 430” or "Union”) represents certain employees at the facility, namely truck drivers, warehousemen, material handlers, and other helpers. A collective bargaining agreement (“CBA”) existed between Local 430 and Brocker Rebar, effective from December 1, 1996 to November 30, 1999. The purchase agreement between AmeriSteel and Brocker Rebar included various provisions' expressly stating that AmeriSteel was not to be bound by the terms of the CBA. In its dealings with the Union, AmeriSteel has consistently and repeatedly maintained that it is not bound by the terms of the CBA, and therefore that it is not bound to arbitrate under the agreement.
AmeriSteel hired roughly 50 employees to work in the York facility, and all but six members of Local 430 who had worked for Brocker Rebar were hired by AmeriSteel. In addition, AmeriSteel retained four Brocker Rebar executives. Because it had hired a majority of the Local 430 members who had worked for Brocker Rebar, Amer-iSteel was obligated to bargain with the Union. Bargaining with the Union broke down, however, on May 10, 1999, when AmeriSteel withdrew recognition of the Union based on a petition purportedly signed by a majority of the Union employees, in which they supposedly stated that they no longer wanted to be represented by Local 430. The Union then initiated an unfair labor practices action against Amer-iSteel before the NLRB, but that action is not before us on appeal.
Local 430 filed a grievance on behalf of all its members against Brocker Rebar and AmeriSteel on April 22, 1999, challenging unilateral changes that would occur in working conditions at the York facility when the AmeriSteel purchase agreement was consummated. Closing under the purchase agreement occurred on April 29, 1999. In May 1999, after the parties were unable to resolve the grievance, the Union requested arbitration pursuant to the arbitration clause in the CBA. AmeriSteel filed a Complaint and motion for injunctive relief in the United States District Court for the Middle District of Pennsylvania on December 9, 1999, seeking to enjoin Local 430 and the American Arbitration Association from proceeding to arbitration with AmeriSteel as a party. On March 17, 2000, the District Court granted AmeriS-teel a preliminary injunction, reasoning that AmeriSteel could not be bound to arbitrate under the pre-existing CBA because AmeriSteel was not the “alter ego” of Brocker Rebar, nor had AmeriSteel agreed to abide by the CBA.App. at 256-57.
Local 430 complains on appeal that the District Court should not have granted the preliminary injunction in the first place, and that the court compounded its error by, in effect, granting a permanent injunction without analyzing the applicable standard for granting a permanent injunction. Unfortunately, the District Court might have caused some unnecessary confusion by not explicitly stating that it was, in fact, granting a permanent injunction, and not merely a preliminary one. We have in the past admonished district courts to avoid this type of oversight. E.g., CIBA-GEIGY Corp. v. Bolar Pharm. Co., 747 F.2d 844, 847 (3d Cir.1985) (observing that although the Third Circuit could convert the district court’s opinion into a permanent injunction, “we would much prefer that the district court recast its own opinion in the language of the standard it is applying. This would eliminate the possibility of confusion as to what the district court intended and would, in the long run, promote judicial economy”).
Nonetheless, it is apparent that the District Court implicitly granted a permanent injunction, and we find no reversible error *267 in the court’s procedure. In its opinion, the District Court announced a legal standard under which Local 430 could prevail only if it could prove that AmeriSteel was the “alter ego” of Brocker Rebar, or that AmeriSteel had agreed to abide by the CBA. It is undisputed that AmeriSteel is not the “alter ego”[1] of Brocker Rebar and that AmeriSteel has expressly rejected the CBA. Thus, there were no triable issues of fact and no need for a trial on the merits. In other words, AmeriSteel had already prevailed on the merits, and therefore the District Court’s order, in effect, grants AmeriSteel a permanent injunction. Any further proceedings in the District Court would have served no purpose. Consequently, we are squarely presented with the question of whether AmeriSteel can be bound to arbitrate under the CBA.
III. Jurisdiction and Standard of Review
The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185. Because the District Court’s order, in effect, grants a permanent injunction, we have appellate jurisdiction pursuant to 28 U.S.C. § 1291, which provides for appeals of all final decisions of the federal district courts.
We review a district court’s decision to grant or deny a permanent injunction under an abuse of discretion standard. E.g., ACLU v. Black Horse Pike Reg’l Bd. of Educ., 84 F.3d 1471, 1476 (3d Cir.1996). However, because an abuse of discretion exists where the district court’s decision “rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact,” id., we apply plenary review to the District Court’s legal conclusions.
IV. Discussion
This case requires us to navigate the treacherous waters of the Supreme Court’s labor law successorship doctrine, which has, at times, imposed extra-contractual duties upon successor employers. Appellant Local 430 argues that AmeriSteel, as a successor employer to Brocker Rebar, must arbitrate grievances brought by the Union under the collective bargaining agreement between the Union and Brock-er Rebar. AmeriSteel counters that it was never a party to the CBA, expressly rejected it during its asset purchase negotiations with Brocker Rebar, and has consistently maintained in its dealings with the Union that it is not bound by the terms of the CBA, including its arbitration clause. Accordingly, AmeriSteel argues that it cannot be compelled to submit to arbitration.
As an initial matter, we note that labeling AmeriSteel a “successor employer” to Brocker Rebar does little to help resolve the issue in this case. As the Supreme Court has explained, a new employer, like AmeriSteel, “may be a successor for some purposes and not for others,” and the question whether AmeriSteel is a successor to Brocker Rebar “is simply not mean *268 ingful in the abstract.” Howard Johnson Co. v. Hotel and Restaurant Employees, 417 U.S. 249, 262 n. 9, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Accordingly, the question we must ask is: what are the legal obligations of AmeriSteel to the employees of Brocker Rebar? Id. Or more specifically: does AmeriSteel have a duty to arbitrate with the Union under the CBA? As the District Court correctly noted, the resolution of that latter question depends, in large part, on the proper interpretation of three decisions of the U.S. Supreme Court: John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and Howard Johnson Co. v. Hotel and Restaurant Employees, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).
While other courts have tried to make sense of these three opinions, we find no analysis that charts a perfect course that we can readily follow. Accordingly, we will make our own way through the progression of the Supreme Court’s reasoning. As the dissent points out, it is unfortunate that the law in this area is unsettled, and ultimately, only the Supreme Court can silence the conflict that exists in the troubled trilogy of Wiley, Bums, and Howard Johnson. Given the tension that exists in this trilogy, no approach to reconciling these cases will be completely satisfying. Nevertheless, we think it significant that, as discussed below, our ultimate result (and the logic that underpins it) is supported by the majority of courts that have articulated the contours of labor law suceessorship.
In Wiley, the Court introduced the idea that a successor employer could be bound by an arbitration clause in a collective bargaining agreement between the predecessor employer and its unionized employees. The predecessor employer, Interscience, had merged with John Wiley & Sons, and ceased to do business as a separate entity. The Union then brought suit against Wiley to compel arbitration under the collective bargaining agreement. Wiley, 376 U.S. at 544-45, 84 S.Ct. 909. The Court posed the legal issue as follows: “whether Wiley, which did not itself sign the collective bargaining agreement on which the Union’s claim to arbitration depends, is bound at all by the agreement’s arbitration provision.” Id. at 547, 84 S.Ct. 909. The Court answered this question in the affirmative. Id. at 550-51, 84 S.Ct. 909.
The Court acknowledged that “the principles of law governing ordinary contracts would not bind to a contract an unconsent-ing successor to a contracting party,” but distinguished the case at hand by explaining that “a collective bargaining agreement is not an ordinary contract.” Id. at 550, 84 S.Ct. 909. The Court grounded this extra-contractual duty in federal law — specifically, “the policy of our national labor laws,” id. at 548, 84 S.Ct. 909, which recognized both the “central role of arbitration” and the importance of “protecting] ... employees from a sudden change in the employment relationship,” id. at 549, 84 S.Ct. 909. Thus, the Court explained, “the impressive policy considerations favoring arbitration are not wholly overborne by the fact that Wiley did not sign the contract being construed.” Id. at 550, 84 S.Ct. 909.
The Court’s holding is actually quite limited:
We hold that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be *269 required to arbitrate with the union under the agreement.
376 U.S. at 548, 84 S.Ct. 909.
The Court then went on to note that “[w]e do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives.” Id. at 551, 84 S.Ct. 909. Rather, factors such as lack of “substantial continuity of identity in the business enterprise”' before and after the change could alter the result; so could the parties’ conduct, if, for instance, the union fails to continue to make its claims known. Id. Without continuity, the duty to arbitrate would be “something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved.” Id. Thus, the “substantial continuity” concept — first alluded to by the Court after it announced its holding — should properly be viewed as a necessary but not a sufficient condition for the imposition of arbitration on an unconsenting successor.
The Court also observed that “[o]f course, the Union may not use arbitration to acquire new rights against Wiley” that were not grounded in the collective bargaining agreement itself. Id. at 555, 84 S.Ct. 909. Whether the Union’s demands had merit was for the arbitrator to decide in light of the facts, yet arbitration would be inappropriate if “it can be seen in advance that no award to the Union could receive judicial sanction.” Id. Such was not the case in Wiley — because the Union’s demands were not “plainly unreasonable” — and therefore the Court permitted the demands to proceed to arbitration. Id.
Although the Wiley holding, strictly speaking, addresses only the duty to arbitrate, we have in the past noted that a necessary implication of Wiley’s holding is that Wiley, the successor employer, could possibly be bound by the substantive terms of the CBA. E.g., Local Union No. 249 v. Bill’s Trucking, Inc., 493 F.2d 956, 960 (3d Cir.1974). This conclusion “is manifest from the fact that the very question upon which the successor must, under Wiley, submit to arbitration, is the extent to which the other terms of the predecessor’s contract are binding on the successor.” Id. at 960 n. 20. If Wiley could not possibly be bound by the substantive terms of the CBAl, arbitration would be a wholly pointless exercise. Moreover, if the terms could not possibly be enforced against Wiley, then no arbitration award to the Union “could receive judicial sanction,” and thus the Wiley Court would not have permitted the case to proceed to arbitration in the first place. Wiley, 376 U.S. at 555, 84 S.Ct. 909.
In Bums, the Supreme Court took a very different approach to the issue of whether a successor employer could be bound by the substantive terms of its predecessor’s CBA. The predecessor employer, the Wackenhut Corporation, had provided plant protection services at a Lockheed Aircraft Service plant for several years before the successor, Burns International Security Services, took over this task after outbidding Wackenhut for the security contract. Burns, 406 U.S. at 274-75, 92 S.Ct. 1571. A majority of the employees hired by Burns had been employed by Wackenhut, but Burns refused to honor the existing CBA between Wackenhut and these employees. The Union then filed an unfair labor practice charge with the NLRB, and the Board ordered Burns to comply with the CBA executed by Wackenhut. Id. at 275-77, 92 S.Ct. 1571.
In reversing the NLRB, the Supreme Court endorsed the Board’s earlier, consistently-held interpretation that successor employers could not be bound against their will by the substantive terms of existing *270 CBAs. Id. at 285-91, 92 S.Ct. 1571. Specifically, the Bums Court noted that:
These considerations, evident from the explicit language and legislative history of the labor laws, underlay the Board’s prior decisions, which until now have consistently held that, although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.
Id. at 284, 92 S.Ct. 1571 (emphasis added).
In reaching its decision, the Bums Court stated that the federal labor policy of preventing industrial strife did not outweigh “the bargaining freedom of employers and unions.” Id. at 287, 92 S.Ct. 1571. Therefore Burns, which had “in no way agreed” to the existing CBA, could not be compelled to accept contract provisions against its will. Id. at 282, 287, 92 S.Ct. 1571. Moreover, the Court reasoned, forcing either a union or a successor employer to be bound by the substantive terms of an old CBA “may result in serious inequities.” Id. at 287, 92 S.Ct. 1571. For example, saddling successor employers with the terms and conditions contained in old CBAs “may discourage and inhibit the transfer of capital” because many potential employers will be willing to rescue moribund businesses only if they can negotiate their own CBAs. Id. at 287-88, 92 S.Ct. 1571. Additionally, a union may have made concessions to a small or economically-troubled predecessor employer that it would not be willing to make to a large or economically powerful successor. Id. at 288, 92 S.Ct. 1571. In sum, the balance of bargaining advantage between employers and labor should “be set by economic power realities,” and the federal labor policy of avoiding industrial strife would be ill-served by binding either employers or employees to contract terms that “do not correspond to the relative economic strength of the parties.” Id.
Wiley and Bums, therefore, appear to be in direct conflict. On the one hand, the holding in Wiley necessarily implies that unconsenting successor employers may be bound by the substantive terms of preexisting CBAs. But on the other hand, Bums endorses the idea that unwilling successors cannot be bound by such terms. As the principal means of distinguishing these two cases, the Bums Court offered the somewhat unsatisfying distinction that Wiley arose in the context of a suit to compel arbitration, whereas Bums involved an unfair labor practice proceeding in front of the NLRB.[2] Id. at 285-86, 92 *271 S.Ct. 1571. Not surprisingly, in the aftermath of Bums, courts struggled to reconcile Bums with Wiley, and could do little more than repeat the Supreme Court’s emphasis on the procedural distinction between the two cases. E.g., Bill’s Trucking, 493 F.2d at 961 (noting that “it was specifically emphasized in Bums that Wiley arose in the context of a ... suit to compel arbitration, not in the context of an unfair labor practice proceeding,” and that “Bums, then, cannot be read to foreclose absolutely the imposition upon a successor employer of the contract obligations entered into by its predecessor”).
It is against this backdrop that, just two years after Bums, the Supreme Court took up the issue of labor law successor-ship in Howard Johnson. The Court began by acknowledging the conflicting reasoning of Wiley and Bums, but rejected the idea that the cases could be distinguished on the basis of their procedural context, because distinguishing the cases in this manner would inappropriately “permit the rights enjoyed by the new employer in a successorship context to depend upon the forum in which the union presses its claims.” Howard Johnson, 417 U.S. at 256, 94 S.Ct. 2236. With this distinction repudiated, the Hoiuard Johnson Court appeared to be squarely faced with an irreconcilable conflict between Wiley and Bums: either the substantive terms of an existing CBA could be imposed against an unconsenting successor, as is implicit in Wiley, or they could not, as stated by Bums.
The Howard Johnson Court, however, chose not to deal with this conflict, and instead walked a very narrow path. Rather than deciding “whether there is any irreconcilable conflict between Wiley and Bums,” the Court decided the case on the ground that “even on its own terms, Wiley does not support the decision of the courts below,” which had compelled the successor employer, Howard Johnson, to submit to arbitration pursuant to a CBA between its unionized employees and the predecessor employer, the Grissoms. Id. at 256, 94 S.Ct. 2236. In other words, even on its own terms, Wiley did not compel the conclusion that Howard Johnson must proceed to arbitration against its will, and likewise could not justify imposing the substantive terms of the CBA against Howard Johnson.
The Hoivard Johnson Court contrasted the facts of its case with Wiley, noting that the most important distinction is that in Wiley, “the surviving corporation hired all the employees of the disappearing corporation,” whereas in Howard Johnson the successor “hired only nine of the 53 former Grissom employees and none of the Grissom supervisors.” Id. at 258, 260, 94 S.Ct. 2236. The Court emphasized that, because Howard Johnson had hired so few of the Grissom employees, there was no “substantial continuity in the identity of the work force across the change in ownership,” which placed the case outside the realm of Wiley. Id. at 262-63, 94 S.Ct. 2236. Wiley had stated that the lack of “substantial continuity” would remove the situation from the ambit of its holding, and the lack of substantial continuity thus dictated the result.
*272 It is important, for the purposes of this appeal, to appreciate the limited scope of the Court’s decision in Howard Johnson. As explained above, the Court did not reconcile the conflict between Wiley and Bums. The Howard Johnson Court simply pointed out that, consistent with Wiley, and on Wiley’s own terms, the lack of substantial continuity meant that the Court needed to look no further. Accordingly, Hoioard Johnson does not bridge the gap between Wiley and Bums, nor does it establish broadly applicable guiding principles that should be implemented when analyzing labor law successorship problems.[3]
Still, Hoivard Johnson does give some indication as to the Court’s thinking on the. conflict between Wiley and Bums. Throughout the opinion, the Court downplays the significance of Wiley, describing its holding as a “guarded, almost tentative statement,” id. at 256, 94 S.Ct. 2236, and focusing on the limited factual context in which Wiley arose, id. at 256-64, 94 S.Ct. 2236. In contrast, the Court takes an expansive view of Bums, repeatedly extolling its reasoning. Stating at the outset that “[c]learly the reasoning of Bums must be taken into account here,” id. at 256, 94 S.Ct. 2236, the Howard Johnson Court goes on to observe that “[w]hat the Union seeks here is completely at odds with the basic principles this Court elaborated in Burns,” id. at 261, 94 S.Ct. 2236, and that the reasoning in Bums “established that Howard Johnson had the right not to hire any of the former Grissom employees, if it so desired,” id. at 262, 94 S.Ct. 2236. In short, the best reading of Howard Johnson is that it does not resolve the conflict between Wiley and Bums, but it does much to strengthen and reaffirm the reasoning of Bums, and certainly does nothing to call into question Bums’ assertion that successor employers “are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.” Burns, 406 U.S. at 284, 92 S.Ct. 1571.
Nevertheless, one might argue (at least in theory) that Bums has somehow been modified by Howard Johnson, based on the reasoning that Howard Johnson’s emphasis on “substantial continuity in the identity of the work force” necessarily implies that if such “substantial continuity” does exist, then arbitration under the existing CBA would be appropriate. And if such arbitration were to go forward, it follows that the substantive terms of the CBA could be enforced, and thus Bums cannot survive intact.[4]
*273 In our view, however, this reading of Hoivard Johnson would stretch its carefully circumscribed holding beyond recognition. As explained above, the holding in Hoivard Johnson does nothing more than simply point out that on the facts of the case, not even Wiley (and certainly not Bums) could justify forcing Howard Johnson to submit to arbitration against its will. In other words, because the Court was able to base its result on the lack of “substantial continuity,” it simply did not reach the issue of whether, had there been “substantial continuity,” the successor employer would have been forced to arbitrate and necessarily could have been bound by the substantive terms of the CBA. Indeed, nothing in the Hoivard Johnson opinion calls into question either the reasoning or the holding of Burns — as explained above, there is much in the opinion that reaffirms Bums — and thus we cannot accept any interpretation of Howard Johnson that either explicitly or implicitly modifies Bums’ conclusion that a successor employer cannot be bound against its will by the substantive provisions of its predecessor’s CBA. Here, the parties specifically agreed that the CBA would not be binding, and Bums teaches that we must respect that agreement.
Our reading of Bums and Howard Johnson is confirmed by the Supreme Court’s observations in Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). In reviewing the principles of labor law suc-cessorship, the Court reiterated Burns’ assertion that “the successor ... is not bound by the substantive provisions of the predecessor’s collective-bargaining agreement.”[5] Fall River, 482 U.S. at 40, 107 S.Ct. 2225 (citing Burns, 406 U.S. at 284, 92 S.Ct. 1571). Significantly, in the very next sentence, the Court cited Howard Johnson, so it cannot be argued that the Fall River Court somehow overlooked Howard Johnson when reaffirming Bums. Rather, the only conclusion that can be drawn is that after Howard Johnson, Bums rests on solid ground.
This conclusion, however, serves to illuminate the perplexing issue presented by this appeal — namely, that while the validity of Bums cannot be doubted, Bums nonetheless conflicts with the implications of Wiley. The most we can say with assurance regarding this conflict is that while the contours of Wiley are narrow, and its status not entirely clear, Bums’ language and logic have been reinforced in later cases. Accordingly, we believe the clear mandate of Bums — that an unconsenting successor employer cannot be bound by the substantive terms of a CBA negotiated by its predecessor — provides more persuasive guidance than the limited holding in Wiley. That being the case, AmeriSteel cannot be bound by the substantive terms of the CBA at issue here, which was negotiated between Brocker Rebar and the Union and which AmeriSteel’s purchase agreement specifically stated would not be binding on it. *274 And because AmeriSteel cannot be bound by the substantive terms of the CBA, no arbitration award to the Union — -which, of course, would be based on the substantive terms of the CBA — could receive judicial sanction, and therefore AmeriSteel cannot be compelled to submit to arbitration.[6] Wiley, 376 U.S. at 555, 84 S.Ct. 909.
While there is no directly controlling authority in our Circuit, nonetheless we think the result that we reach here flows logically from our existing Circuit precedent. For example, in Stardyne, Inc. v. NLRB, 41 F.3d 141 (3d Cir.1994), we observed that a successor has an obligation to recognize and bargain with the union that represented its predecessor’s employees, but that a successor is “not bound by its predecessor’s collective bargaining agreement.” Id. at 145 n. 3. Similarly, in Pick-Mt. Laurel Corp. v. NLRB, 625 F.2d 476 (3d Cir.1980), we noted that when analyzing labor law successorship, the Supreme Court has held “that a successor does not stand in the same shoes as its predecessor because it will not be bound to the previously bargained for terms, [and] the Court construed the relevant policies to prevent imposing on the successor an obligation to be bound by past events and arrangements.” Id. at 484. And, as explained above, if AmeriSteel cannot be bound by these “past events and arrangements” in the form of Brocker Rebar’s CBA, then it necessarily follows that arbitration under the CBA is inappropriate because no award for the Union “could receive judicial sanction.”[7] Wiley, 376 U.S. at 555, 84 S.Ct. 909.
*275 Moreover, we find it significant that our resolution of this case is supported by the decisions of our sister circuit courts of appeals. Indeed, in the time since Fall River, every one of our sister circuits that has addressed the issue has concluded that an unconsenting successor employer cannot be bound by the substantive terms of an existing CBA.[8] E.g., Local 7-517 v. Uno-Ven Co., 170 F.3d 779, 781 (7th Cir.1999) (stating that when a successor purchases a predecessor’s business, the successor “would not be bound by the collective bargaining contract”); NLRB v. Hosp. San Rafael, Inc., 42 F.3d 45, 50 (1st Cir.1994) (observing that “[wjhere, for example, a unionized business is acquired by a new owner unaffiliated with the old one, the new employer may not be bound by a collective bargaining agreement with the old one”); Southward v. S. Cent. Ready Mix Supply Corp., 7 F.3d 487, 495 (6th Cir.1993) (asserting that the Supreme Court has “repeatedly recognized that a successor corporation may be bound by the substantive terms of its predecessor’s CBA only if the successor is the alter ego of the predecessor or the successor has expressly or impliedly assumed the obligations of its predecessor’s contract”); Sullivan Indus. v. NLRB, 957 F.2d 890, 895 (D.C.Cir.1992) (noting that “[w]hile a successor has a duty to bargain with an incumbent union, it is not bound by the substantive terms of the previously negotiated collective-bargaining agreement”); New England Mech., Inc. v. Local Union 294, 909 F.2d 1339, 1342 (9th Cir.1990) (explaining that a successor employer “is not bound by its predecessor’s collective bargaining agreement,” and that “the Supreme Court has continually indicated that a successor employer is only bound to bargain with a union which had a CBA with the predecessor”). District courts in our Circuit have come to the same conclusion. E.g., Philadelphia Joint Bd. v. After Six, Inc., No. 92-4294, 1992 WL 202166, at *2 (E.D.Pa. Aug.6, 1992) (maintaining that “if an employer takes over another business, the employer is not bound by its predecessor’s collective bargaining agree *276 ments. At most, the employer will be required to bargain with any unions that the predecessor employer had recognized.”); Local Union No. 4 v. Owens-Illinois, Inc., 758 F.Supp. 962, 973 (D.N.J.1991) (observing that “[u]nder Wiley and Bums, although [the successor] had an obligation to recognize and bargain with the Union ... [the successor] could not be required to assume [the predecessor’s] labor contract”). Additionally, many commentators are in accord. E.g., Burton F. Boltuch, Workplace Closures and Company Reorganizations: Enforcing NLRB, Contract and Noncontract Claims and Obligations, 7 Lab. Law. 53, 78 (1991) (explaining that “[ejourts and arbitrators since Bums do not hold the ‘unconsenting’ successor to the CBA”); Claiborne Barks-dale, Successor Liability Under the National Labor Relations Act and Title VII, 54 Tex. L.Rev. 707, 711 (1976) (arguing that a “successor will not be bound ... by the substantive terms of the predecessor’s contract with the employees unless it either explicitly or impliedly ratifies the agreement”); Wilson McLeod, Rekindling Labor Law Successorship in an Era of Decline, 11 Hofstra Lab. L.J. 271, 308-09 (1974) (explaining that “courts are firmly opposed” to enforcing the substantive terms of a predecessor’s CBA against a successor, and that if the Bums holding rests on solid footing, then “there is no principled reason why successors should be forced to arbitrate at all”).
Given the prevailing case law supporting our view, and given the teachings of Wiley and Bums that expose the futility and inappropriateness of arbitration when the substantive terms of the bargaining agreement cannot be binding on the new entity, we are curious as to what purpose is to be served by arbitration? How can we hold, as the dissent would, that such a pointless exercise is mandated, especially given the fact that the specific contractual provisions between the parties did in fact not merely “shed” the prior agreement containing the arbitration provisions, but specifically contracted them away?
Finally, we think it is important to note that our decision in this case does not overlook the vital importance of arbitration as a means of settling labor disputes. We have in the past observed that federal labor law elevates labor arbitrators “to an exalted status,” Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1126 (3d Cir.1969), and that “courts play an extremely limited role in resolving labor disputes,” News Am. Publ’n, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir.1990). Moreover, an arbitration award must be enforced “[a]s long as the arbitrator has arguably construed or applied the contract,” News Am., 918 F.2d at 24 (emphasis in original), which is in accord with the Supreme Court’s instruction that an arbitration award is legitimate as long as it “draws its essence from the collective bargaining agreement,” United Paperworkers Int’l Union v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).
What distinguishes this case, however, is that because AmeriSteel cannot be bound by the substantive terms of the CBA between Brocker Rebar and the Union, there simply is no contract for the arbitrator to construe. While we must respect the vital role that arbitration plays in settling labor disputes (and the correspondingly broad authority granted to arbitrators), we think it goes without saying that courts should not compel parties to submit to arbitration when there is nothing to arbitrate. To hold otherwise would create the paradoxical situation in which AmeriSteel would be forced to arbitrate the extent of its obligations under the CBA, and yet, because it has no such obligations, the arbitrator *277 would be powerless to enforce these obligations.
One might argue that even though Am-eriSteel has no obligations under the CBA, this case should still proceed to arbitration on the theory that an arbitrator could conceivably grant an award to the Union based on some general sense of equity or fairness. Even granting this possibility, such an award would be illegitimate because it would “simply reflect the arbitrator’s own notions of industrial justice” and would not “draw its essence from the contract” itself. Misco, 484 U.S. at 38, 108 S.Ct. 364. As Chief Judge Becker has highlighted, an arbitrator’s authority is quite broad, but it is not unlimited, because courts cannot “permit[ ] the arbitrator to transform the contractual arbitration into an equitable dispensation of his own brand of industrial justice, an endeav- or expressly forbidden by the Supreme Court’s decision in United Paperworkers Int’l Union v. Misco, Inc., 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).” News Am. Publ’n, Inc. v. Newark Typographical Union, Local 103, 921 F.2d 40, 41 (3d Cir.1990) (Becker, J., dissenting from denial of rehearing en banc).
Our decision here recognizes the sound principle that arbitration, while critically important to settling labor disputes, nonetheless cannot be used as a means to achieve illegitimate ends. Were we to permit this case to proceed to arbitration, we would be guilty of “wav[ing] a wand” over the arbitration proceedings by engaging in the fiction that an arbitrator could legitimately grant an award for the Union. Id. at 42, 108 S.Ct. 364. But when arbitration is placed within its proper limits, there is no escaping the conclusion that AmeriS-teel, which is not bound by the substantive terms of the CBA, cannot be compelled to submit to arbitration because no arbitration award to the Union could receive judicial sanction.
Accordingly, the March 17, 2000 order of the District Court will be AFFIRMED.

. Under the “alter ego” doctrine, a successor employer "is subject to all the legal and contractual obligations of the predecessor” when the successor is a mere “alter ego” of the predecessor, or nothing more than "a disguised continuance of the old employer." NLRB v. Omnitest Inspection Servs., 937 F.2d 112, 118 (3d Cir.1991). An “alter ego” relationship exists “when there is a mere technical change in the structure or identity of the old employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management.” Id. As the District Court observed, AmeriS-teel’s purchase of Brocker Rebar was a transaction involving two unrelated parties, and there “has been no suggestion that AmeriS-teel is a sham or alter ego of Brocker Rebar.” App. at 255.

. The Burns Court also suggested that Wiley and Bums could be distinguished on the basis that Wiley involved a merger, which triggered the general state law rule "that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation.” Burns, 406 U.S. at 286, 92 S.Ct. 1571. In Wiley, the Court had noted that the union’s argument — which may well have influenced its specific holding — was based on principles of corporate consolidation. Wiley, 376 U.S. at 547-48, 84 S.Ct. 909 ("The Union relies on § 90 of the N.Y. Stock Corporation Law, ... which provides, among other things, that no 'claim or demand for any cause’ against a constituent corporation shall be extinguished by a consolidation.”). In Howard Johnson, the Court again noted this distinction with approval, Howard Johnson, 417 U.S. at 257, 94 S.Ct. 2236, yet the Court has since downplayed this distinction as determinative of a successor's labor law obligations, e.g., Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 44 n. 10, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987) (noting that "the way in which a successor obtains the predecessor's assets is generally not determinative” of the successor’s labor law obligations); see also Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (observing that "[t]he perimeters of the labor-law doctrine of suc-cessorship” are not confined by the bound *271 aries of state corporation law, and that "[t]he refusal to adopt a mode of analysis requiring the Board to distinguish among mergers, consolidations, and purchases of assets” is due to the fact that as long as there is "continuity in the employing industry, the public policies underlying the doctrine- will be served by its broad application”). We have ourselves implicitly indicated that no special significance should be attached to the fact that Wiley involved a merger. E.g., Bill’s Trucking, 493 F.2d at 957-61 (applying Wiley in the context of a sale of capital stock).

. Our main point of disagreement with our dissenting colleague is in our view that Howard Johnson’s focus on substantial continuity does not make it the sole basis for finding a continuing duty to arbitrate or making agreements binding, but, rather, as one sine qua non. There is a difference: while the existence of substantial continuity is a necessary ingredient, its presence does not necessarily render the new entity bound. (If one is not 35 years of age, one cannot be President of the United States; this is a sine qua non. However, if one is 35 years of age, he or she does not necessarily qualify. Being a native-born citizen is another sine qua non, in fact.) The difficulty, having explored the three "guiding” cases, is that we must determine what are all the sine qua nons. We cannot subscribe to the dissent's view that these cases equate substantial continuity with suc-cessorship or "mandates” such a finding here. Clearly, as Wiley itself indicates, other factors must also be considered. See Wiley, 376 U.S. at 551, 84 S.Ct. 909. Bums says that contractual understandings are important, but the dissent discredits that concept. While we concede that the scope of the directive of Bums may not be crystal-clear, we suggest that the directives of Wiley and Howard Johnson are clearly narrower than the dissent’s view would allow.

. While the dissent does not frame its argument in precisely these terms, nonetheless this reasoning is implicit in the dissent's conclusion'that "there is sufficient 'substantial *273 continuity of identity in the business enterprise/ between Brocker Rebar and AmeriS-teel to justify holding that AmeriSteel is bound to the arbitration provision (and possibly to the substantive provisions) of Brocker Rebar’s CBA with Local 430.” Dissenting Op. at 285.

. The dissent attempts to downplay the significance of this statement by characterizing it as a “cryptic piece of dicta.” Dissenting Op. at 285 n. 2. While it is arguably dicta, there certainly is nothing “cryptic” about it. This is a simple, straightforward statement that makes a general observation about successors, taken almost word-for-word from Bums. The dissent would re-write the statement as referring to only "Buras-type successors,” but we see no reason to believe that the Fall River Court meant anything other than what it said.

. In reaching this conclusion, we are not, as the dissent appears to indicate, overstepping our authority as a lower federal court by "emasculat[ing] Wiley." Dissenting Op. at 281. Rather, when faced with a body of Supreme Court precedent that is, as the dissent points out, "discordant in [ ] overall tone and approach,” id. at 277, we are simply choosing what we believe to be the best interpretation. And in so doing, we are performing our appropriate role as a federal appellate tribunal in the most basic sense. (The dissenting opinion arguably emasculates Burns in similar fashion when it urges that the sales agent expressly repudiating the CBA is "irrelevant to the analysis.” Dissenting Op. at 283.)
Moreover, we do not agree that our result in this case necessarily emasculates Wiley, or relegates it "to the dustbin of history,” Dissenting Op. at 282, although we do decline to give Wiley as broad a reading as does Chief Judge Becker. We suggest that one who reads Wiley on its own, start to finish, would be struck by its careful and restrictive analysis, which leads to its equally narrow holding, which we quoted above, that collective bargaining agreement provisions do not automatically go by the wayside when a corporate consolidation occurs. Wiley, 376 U.S. at 548, 84 S.Ct. 909.

. Several other cases in our Circuit have addressed the labor law successorship doctrine, but we find these decisions of limited utility. For example, in Local Union No. 249 v. Bill's Trucking, Inc., 493 F.2d 956 (3d Cir.1974), we addressed Wiley and Bums, but we distinguished the two cases based on their procedural distinction. Id. at 961. As explained above, the Court has since rejected this means of distinguishing the cases. Supra p. 272. In American Bell Inc. v. Federation of Telephone Workers, 736 F.2d 879 (3d Cir.1984), we touched upon the successorship doctrine, but ultimately did not reach the issue because we concluded that the doctrine did not apply. Id. at 888. And in Teamsters Local Union No. 430 v. Cement Express, Inc., 841 F.2d 66 (3d Cir.1988), we construed Bums somewhat narrowly, but we think it unwise to place any particular emphasis on this case. As a case primarily concerned with the imposition of Rule 11 sanctions, Cement Express did not give labor law successorship a thorough treatment, as evidenced by the fact that in our discussion, we did not mention Howard Johnson or Fall River. Id. at 69. Moreover, in distinguishing Wiley and Bums, we relied on the procedural distinction between the two cases that the Court has repudiated. Id.
In concluding that AmeriSteel had no duty to arbitrate, the District Court appeared principally to rely upon our decision in NLRB v. *275 Phoenix Pipe & Tube, 955 F.2d 852 (3d Cir.1991), which the District Court characterized as standing for the proposition that "by retaining the workforce of a prior employer, a subsequent employer becomes obligated to bargain with a union, but not to abide by the collective bargaining agreement.” App. at 257. This is a puzzling statement, however, because Phoenix Pipe does not support this proposition, and the District Court included no supporting citation to the case. Given that Phoenix Pipe says nothing regarding a successor's obligations under its predecessor's CBA, we conclude that the case is not relevant to the issues presented by this appeal. Accordingly, while we agree with the District Court's ultimate conclusion that AmeriSteel cannot be compelled to arbitrate, we disagree with the reasoning that the District Court employed to arrive at that result.

. The dissent states that the case law from other courts of appeals "cuts in both directions,” Dissenting Op. at 287, but, we cannot agree. It references only two appellate cases that supposedly cut in its favor, id. at 287 n. 4, but neither case is particularly relevant. Boeing Co. v. International Association of Machinists and Aerospace Workers, 504 F.2d 307 (5th Cir.1974), predates Fall River, and therefore is of limited utility. And in Stotter Division of Graduate Plastics Co. v. District 65, 991 F.2d 997 (2d Cir.1993), the court based its determination that Stotter was a successor employer not only on continuity, but also on the fact that the obligations at issue arose before the transfer, and the fact that Stotter had "entered into an agreement with the Union which adopted (with immaterial exceptions) the provisions of the [CBA].” Id. at 1002. Thus, Stotter is not persuasive on this issue. The dissent can cite no post-Fall River case in our sister circuits that has bound an unconsenting successor employer to the substantive provisions of an existing CBA. We submit there are none. Indeed, were che dissent’s interpretation to prevail, it would place us squarely at odds with every court of appeals to consider this issue, as noted above.